WILSON, SECRETARY OF DEFENSE, ET AL.
*v.* GIRARD.

No. 1103.   Argued July 8, 1957.—Decided July 11, 1957.

*Solicitor General Rankin* argued the cause for petitioners in No. 1103 and respondents in No. 1108. With him on the briefs were *Attorney General Brownell, Oscar H. Davis, Roger Fisher, Leonard B. Sand* and *Ralph S. Spritzer* in No. 1103, and *Mr. Fisher* and *Beatrice Rosenberg* in No. 1108.

*Joseph S. Robinson* and *Earl J. Carroll* argued the cause for Girard. With them on the brief was *Dayton M. Harrington.*

PER CURIAM.

Japan and the United States became involved in a controversy whether the respondent Girard should be tried by a Japanese court for causing the death of a Japanese woman. The basis for the dispute between the two Governments fully appears in the affidavit of Robert Dechert, General Counsel of the Department of Defense, an exhibit to a government motion in the court below, and the joint statement of Secretary of State John Foster Dulles and Secretary of Defense Charles E. Wilson, printed as appendices to this opinion, *post,* pp. 531, 544.

Girard, a Specialist Third Class in the United States Army, was engaged on January 30, 1957, with members of

his cavalry regiment in a small unit exercise at Camp Weir range area, Japan. Japanese civilians were present in the area, retrieving expended cartridge cases. Girard and another Specialist Third Class were ordered to guard a machine gun and some items of clothing that had been left nearby. Girard had a grenade launcher on his rifle. He placed an expended 30-caliber cartridge case in the grenade launcher and projected it by firing a blank. The expended cartridge case penetrated the back of a Japanese woman gathering expended cartridge cases and caused her death.

The United States ultimately notified Japan that Girard would be delivered to the Japanese authorities for trial. Thereafter, Japan indicted him for causing death by wounding. Girard sought a writ of habeas corpus in the United States District Court for the District of Columbia. The writ was denied, but Girard was granted declaratory relief and an injunction against his delivery to the Japanese authorities. 152 F. Supp. 21. The petitioners appealed to the Court of Appeals for the District of Columbia, and, without awaiting action by that court on the appeal, invoked the jurisdiction of this Court under 28 U. S. C. § 1254 (1). Girard filed a cross-petition for certiorari to review the denial of the writ of habeas corpus. We granted both petitions. U. S. Supreme Court Rule 20; 354 U. S. 928.

A Security Treaty between Japan and the United States, signed September 8, 1951, was ratified by the Senate on March 20, 1952, and proclaimed by the President effective April 28, 1952.[1] Article III of the Treaty authorized the making of Administrative Agreements between the two Governments concerning "[t]he conditions which shall govern the disposition of armed

---

[1] 3 U. S. Treaties and Other International Agreements 3329; T. I. A. S. No. 2491.

forces of the United States of America in and about Japan . . . ." Expressly acting under this provision, the two Nations, on February 28, 1952, signed an Administrative Agreement covering, among other matters, the jurisdiction of the United States over offenses committed in Japan by members of the United States armed forces, and providing that jurisdiction in any case might be waived by the United States.[2] This Agreement became effective on the same date as the Security Treaty (April 28, 1952) and was considered by the Senate before consent was given to the Treaty.

Article XVII, paragraph 1, of the Administrative Agreement provided that upon the coming into effect of the "Agreement between the Parties to the North Atlantic Treaty regarding the Status of their Forces," [3] signed June 19, 1951, the United States would conclude with Japan an agreement on criminal jurisdiction similar to the corresponding provisions of the NATO Agreement. The NATO Agreement became effective August 23, 1953, and the United States and Japan signed on September 29, 1953, effective October 29, 1953, a Protocol Agreement [4] pursuant to the covenant in paragraph 1 of Article XVII.

Paragraph 3 of Article XVII, as amended by the Protocol, dealt with criminal offenses in violation of the laws of both Nations and provided:

> "3. In cases where the right to exercise jurisdiction is concurrent the following rules shall apply:
>
> "(a) The military authorities of the United States shall have the primary right to exercise jurisdiction

---

[2] 3 U. S. Treaties and Other International Agreements 3341; T. I. A. S. No. 2492.

[3] 4 U. S. Treaties and Other International Agreements 1792; T. I. A. S. No. 2846.

[4] 4 U. S. Treaties and Other International Agreements 1846; T. I. A. S. No. 2848.

over members of the United States armed forces or the civilian component in relation to

"(i) offenses solely against the property or security of the United States, or offenses solely against the person or property of another member of the United States armed forces or the civilian component or of a dependent;

"(ii) offenses arising out of any act or omission done in the performance of official duty.

"(b) In the case of any other offense the authorities of Japan shall have the primary right to exercise jurisdiction.

"(c) If the State having the primary right decides not to exercise jurisdiction, it shall notify the authorities of the other State as soon as practicable. The authorities of the State having the primary right shall give sympathetic consideration to a request from the authorities of the other State for a waiver of its right in cases where that other State considers such waiver to be of particular importance."

Article XXVI of the Administrative Agreement established a Joint Committee of representatives of the United States and Japan to consult on all matters requiring mutual consultation regarding the implementation of the Agreement; and provided that if the Committee ". . . is unable to resolve any matter, it shall refer that matter to the respective Governments for further consideration through appropriate channels."

In the light of the Senate's ratification of the Security Treaty after consideration of the Administrative Agreement, which had already been signed, and its subsequent ratification of the NATO Agreement, with knowledge of the commitment to Japan under the Administrative Agreement, we are satisfied that the approval of Article III of the Security Treaty authorized the making of the

Administrative Agreement and the subsequent Protocol embodying the NATO Agreement provisions governing jurisdiction to try criminal offenses.

The United States claimed the right to try Girard upon the ground that his act, as certified by his commanding officer, was "done in the performance of official duty" and therefore the United States had primary jurisdiction. Japan insisted that it had proof that Girard's action was without the scope of his official duty and therefore that Japan had the primary right to try him.

The Joint Committee, after prolonged deliberations, was unable to agree. The issue was referred to higher authority, which authorized the United States representatives on the Joint Committee to notify the appropriate Japanese authorities, in accordance with paragraph 3 (c) of the Protocol, that the United States had decided not to exercise, but to waive, whatever jurisdiction it might have in the case. The Secretary of State and the Secretary of Defense decided that this determination should be carried out. The President confirmed their joint conclusion.

A sovereign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction. *The Schooner Exchange* v. *M'Faddon,* 7 Cranch 116, 136. Japan's cession to the United States of jurisdiction to try American military personnel for conduct constituting an offense against the laws of both countries was conditioned by the covenant of Article XVII, section 3, paragraph (c) of the Protocol that

> ". . . The authorities of the State having the primary right shall give sympathetic consideration to a request from the authorities of the other State for a waiver of its right in cases where that other State considers such waiver to be of particular importance."

The issue for our decision is therefore narrowed to the question whether, upon the record before us, the Constitution or legislation subsequent to the Security Treaty prohibited the carrying out of this provision authorized by the Treaty for waiver of the qualified jurisdiction granted by Japan. We find no constitutional or statutory barrier to the provision as applied here. In the absence of such encroachments, the wisdom of the arrangement is exclusively for the determination of the Executive and Legislative Branches.

The judgment of the District Court in No. 1103 is reversed, and its judgment in No. 1108 is affirmed.

MR. JUSTICE DOUGLAS took no part in the consideration or decision of this case.

## APPENDIX A.*

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

WILLIAM S. GIRARD
United States Army Specialist 3/C,
Petitioner

vs.

CHARLES E. WILSON
Secretary of Defense
et al,
Respondents

H. C. 47–57

## AFFIDAVIT WITH RESPECT TO FACTS

COMMONWEALTH OF PENNSYLVANIA
CITY AND COUNTY OF PHILADELPHIA } SS.

ROBERT DECHERT, being first duly sworn, deposes and says:

I am the General Counsel of the Department of Defense. Personnel of my office collect, collate, and maintain files on the arrangements with regard to the exercise of criminal jurisdiction entered into between the United States and foreign countries. I have reviewed and am familiar with the various communications relating to the incident involving Specialist Third Class William S. Girard which occurred in Japan on 30 January 1957 and state, as a result of such review, and upon information and belief, that the facts surrounding that incident are as follows:

---

*This affidavit was offered by the Government and accepted by the court below under seal. In this posture it is part of the record before us. At the oral argument no objection was made by the Government or counsel for Girard against removing the seal. As the Court considers that the issues in this case should be decided on a fully disclosed record, the affidavit is ordered unsealed.

## The Situation at Camp Weir Firing Range, January 30.

On the afternoon of 30 January 1957, about 30 members of Company F, 8th Cavalry Regiment, were engaged in a small unit exercise at Camp Weir range area, Japan, involving an attack by one squad on a hill defended by another squad. Specialist 3/C William S. Girard was in the "attacking" force. The Commanding Officer of the 8th Cavalry Regiment, COLONEL HERBERT A. JORDAN, states that during the morning he was appalled at the large numbers of Japanese civilian trespassers present in the area and interfering with the conduct of the exercise. He estimates that their number was in excess of 150. In one case a group of six to eight civilians pounced on a machine gun position as soon as the gun ceased firing and, before the gunner could clear his weapon, physically pushed him away from the gun in order to retrieve expended cartridge cases.

The maneuver area consists of approximately eight square miles. It is provided by the Japanese Government for part-time use of United States forces. The Japanese Defense Force uses the same area about 40% of the time. When the area is not in use by either the United States or Japanese armed forces, Japanese civilians are permitted to farm or otherwise use the area. The Japanese civilians of the local village follow the practice of scavenging the expended brass cartridge cases from the maneuver area.

Upon the failure of efforts of military personnel to move the trespassers out of the danger area, Col. Jordan directed that all ball ammunition be withdrawn from the troops, and that blank ammunition be substituted in the afternoon exercise. He also directed that the Japanese police be contacted for assistance in clearing trespassers from the area, so that normal field training might be resumed. Up until the early afternoon, when the shooting incident occurred, this assistance was not forthcoming.

## The Shooting Incident.

After one squad had attacked the hill and before the squads had changed their respective positions so that the attacking force became the defending force, and vice versa, two soldiers, Girard and Specialist 3/C Victor N. Nickel, of the "defending" force, were ordered by their platoon leader, SECOND LIEUTENANT BILLY M. MAHON, who was personally directing their activities to guard a machine gun and some items of personal clothing that had been left on a nearby ridge.

GIRARD in an early statement made during the course of the investigation, stated that he was ordered to get the Japanese away. He is quoted as having stated that he did not receive orders to fire at them to get them away. There is no evidence, other than the statement of Girard, that he was ordered to get the Japanese away.

LIEUT. MAHON stated that he was advised that a machine gun and several field jackets had been left on the other side of Hill 655 and that he instructed Specialist 3/C Girard and Specialist 3/C Nickel to guard the machine gun and keep the Japanese from stealing personal equipment. There were about 20 or 30 Japanese in the area; some were near the machine gun. SPECIALIST 3/C VICTOR N. NICKEL said the Japanese were "just collecting the cartridges, so there was no need of chasing them away".

Girard had a grenade launcher on his rifle. He had been armed with this same weapon during the morning exercises in which he had participated and during which he had fired 80 rounds of ball ammunition. After the two soldiers had arrived on the ridge, Girard, on two occasions, placed an expended 30-caliber cartridge case in the grenade launcher and projected it by firing a blank. At his second shot, a Japanese woman, Mrs. Naka Sakai, fell. An autopsy disclosed that an expended 30-caliber cartridge case had penetrated her back in an upward

direction to a depth of 3½–4 inches, causing her death. The exact distance between Girard and the victim at the time of the incident is uncertain. The Japanese witnesses put it about eighteen meters (approximately 20 yards). On one occasion, Girard stepped off what he thought to be the distance and found it to be 29 feet; on other occasions, he has estimated it to be 20–30 yards. Nickel puts it as 25–30 yards. Girard has stated that he did not intentionally point the rifle at the woman and did not believe the cartridge case would injure anyone if it hit them.

According to the U. S. military authorities in Japan, the act of firing an empty shell case from a grenade launcher is not authorized.

ONOSAKI, a Japanese witness, stated that Girard, after enticing him and the victim toward Girard by throwing some brass on the ground and indicating that it was all right for them to pick it up, suddenly shouted for them to get out and thereupon fired one shot in the direction of Onosaki. As the victim was running away, Onosaki stated that Girard, holding his rifle at the waist, fired a second shot at the victim at a distance of about eight to ten meters. This testimony is corroborated in part by other Japanese who were located at a distance of from 100–150 meters.

Both Girard and Nickel have made a number of statements. NICKEL at first denied knowing anything about the incident. GIRARD admitted only that he had fired one round over the heads of the Japanese. Both gradually changed their testimony. NICKEL, but not Girard, admits to throwing brass on the ground. GIRARD admits that he knew his weapon, fired in the manner in which he fired it, was fairly accurate at short ranges, but denies that he knew of its striking power; he further states that he fired from the waist over the

woman's head and did not intend to hit or wound her, but only to scare the Japanese away.

In one statement, NICKEL, after admitting that he had collected a pile of empty cartridges and had on about five occasions thrown them toward the Japanese, the nearest of whom was a little over 10 yards away, has this to say: "To tell you the truth I don't know if Girard had told you this or not, but Girard told me to throw those cartridges. The purpose was to scare the Japanese off by firing over their heads when they came to pick up the cartridges." After stating that about six Japanese came down to pick up the cartridges, NICKEL concludes: "He (Girard) stood up carrying the gun, and went about two feet to my right. Japanese people started to run away, probably thinking that they were being chased. This one Mama-San also ran. Then Girard fired holding the gun at his hip . . . he held the gun at the hip and fired in the direction of the woman . . . at an angle of about 45 degrees from his body. He fired over the head of this person . . . I regard myself as a friend of Girard in my company. If I said I saw (the incident), I would be letting him down, so I lied. Then I went to Camp Drew and received various advice from an investigator there. Then I decided to tell the truth. One other reason is that Girard told the investigator that Nickel was watching."

In this connection, GIRARD says: ". . . while I was going toward the machine gun, I did talk to Nickel. I do not recall what I talked to him about . . . but I am positive that nothing was spoken about cartridges . . . I do not remember telling him to throw some cartridges. If I said I did not positively talk to him about it I'd be telling a lie . . . what I want to say is, as far as I can remember, I do not recall talking about it." GIRARD states that he has qualified as a marksman [average shot]

and a sharpshooter [better than average shot] with the M-1 with which he was armed on the day in question, and that he twice has qualified as an expert with the .45 caliber pistol; that he has seen soldiers fire empty cartridges out of a grenade launcher on about 10 occasions; and he said, "I did not have an exact idea how far an empty cartridge would travel, but I knew that it travelled quite a ways . . . prior to that incident I knew that the empty cartridge fired like that would travel straight forward."

At a later time Specialist 3/C Nickel requested that he be permitted to make a further statement with respect to the case.   Upon this occasion he stated that Girard had asked him to gather up some empty cartridge cases for the purpose of luring the Japanese people closer to their position; that he and Girard were in a foxhole together and that at Girard's request, in order to draw the Japanese closer, he, Nickel, threw empty cartridge cases from the foxhole; that Girard said, "throw the brass a little closer"; that Girard motioned with his hands for the brass pickers to come closer and said, "Daijobu", which meant for them to come closer; that Girard fired at the Japanese man, and then fired at the Japanese woman and shot her; that Girard was in a standing position and fired from the shoulder; that he (Girard) tried to get the Japanese to take the woman's body away after he shot her; and that Girard told him (Nickel) that if "they" asked how he held his weapon to say he fired from the waist and also to say that "We did not throw any brass."

### The Certificate as to Official Duty

On 7 February 1957 Girard's commanding officer filed a certificate of official duty with the local Japanese authorities.  That certificate read as follows:

COMPANY F

8TH CAVALRY REGIMENT

7 February 1957

SUBJECT: Certificate as to Official Duty

THRU: Provost Marshal
Regional Camp Whittington
APO 201

TO: Chief Procurator
Maebashi District
Maebashi City, Honshu, Japan

1. Pursuant to the provisions of paragraph 43 of the Agreed Views of the Criminal Jurisdiction Subcommittee with respect to the Protocol amending Article XVII of the Administrative Agreement between the United States and Japan, I certify that GIRARD, William S, RA 16 452 809, Specialist Third Class, Company F, 8th Cavalry Regiment, APO 201, was in the performance of his official duty at 1350 hours, 30 January 1957, Camp Weir Range Area, when he was involved in the following incident: On 30 January 1957, 2nd Battalion, 8th Cavalry Regiment, was engaged in routine training at Camp Weir Range Area. Company F was conducting blank firing exercises. Specialist Third Class William S. GIRARD was instructed by his platoon leader to move near a position near an unguarded machine gun to guard the machine gun and items of field equipment that were in the immediate area. GIRARD, following instructions, moved to the designated position near the machine gun. While performing his duties as guard, he fired an expended cartridge case, as a warning, which struck and killed

SAKAI, Naka, Kami-Shinden, Somamura, Gumma Prefecture, who had entered the range area for the purpose of gathering expended cartridge cases.

2. The United States will exercise jurisdiction in this case, unless notification is given immediately that proof to the contrary exists.

3. Should this incident result in trial of the above individual by general court-martial, you will be notified of the date of trial in accordance with the provisions of paragraph 45 of the above mentioned Agreed Views.

CARL C. ALLIGOOD
1st Lt. Infantry
Commanding

The Japanese Notice of "Existence of Contrary Proof".

On 9 February 1957 the local Japanese authorities notified the United States commanding officer who had issued the certificate of official duty that they considered that proof contrary to the certificate existed.  This notification stated:

MAEBASHI DISTRICT PUBLIC
PROCURATOR'S OFFICE

Maebashi, 9 February 1957

TO: Mr. CARL C. ALLIGOOD,
    1st Lt Infantry, Command, F Co.,
    2nd Bn 8th Cavalry Regiment

Re: Notification of the existence of the contrary proof.

Dear Sir:

Reference is made to the letter from you dated on 8 February 1957, regarding to the "On Duty" status of the case involving SP3 GIRARD S. WILLIAM, which we received on 8 February 1957.

This is to inform you that this office considers the proof contrary thereto exists, basing upon our examinations.

/s/ Nagami Sakai
Chief Procurator
Maebashi Public Procurator's Office

## The Japanese Statement in the Criminal Jurisdiction Sub-Committee of the Joint Committee

In accordance with the provisions of Agreed View No. 43, on 16 February 1957 the Japanese brought the matter up in the Joint Committee and requested that it be referred to the Criminal Jurisdiction Subcommittee. On 7 March 1957 the United States representative agreed to this procedure. The matter was discussed in the Subcommittee on 12 March 1957 at which time the Japanese submitted a summary which contained the following:

"He (Girard) and Nickel went to the gun and, about 13.15 hrs he picked up and threw expended cartridge cases in the direction of the slope south of the hill, and, beckoning Hidehara Onozeki (male) and Naka Sakai (female) who had been at a place in the south-west of Hill 655 to gather empty cartridge cases, etc., cried out to them 'PAPA-SAN, DAIJOBU', 'MAMA-SAN, DAIJOBU' ('Old man, O.K., old lady, O.K.'), etc. in Japanese and thus let the 2 Japanese pick up expended cartridge cases he had thrown. Then he, pointing to the nearby hole for Naka Sakai, cried out to her in Japanese 'MAMA - SAN, TAKUSAN - NE' ('Old lady, plenty more!'), and hinting thereby that there remained some expended cartridge cases in it, induced her to go to the hole. But, at that moment, Hideharu Onozeki who was picking up expended cartridge cases on the said slope became suspicious of the suspects behaviour and tried to run away. Then the suspect suddenly shouted to Ono-

seki 'GE-ROU! HEY!' and fired a blank shot towards him, placing an expended cartridge case in the grenade launcher attached to the rifle which he had carried with him. Then he cried out 'GE-ROU! HEY!' to Naka Sakai who was in the hole, and, when he saw her running off towards the north slope of the hill, he, holding the stock of the rifle under his arm, fired standing a blank shot toward her about eight (8) meters away with an expended cartridge case put in the grenade launcher, just in the same manner as he had done to Hideharu Onozeki, as the result of which he made her sustain a penetrating wound on the left side of her back which proved fatal on the spot because of the loss of blood resulting from a cut in the main artery."

The Japanese conclusion was stated as follows:

"Sp–3 William S. Girard, the suspect in this case, had been instructed to guard a machine gun and equipment at the time of occurrence of the case. It is evident, however, as shown in the above finding of facts, that the incident arose when he, materially deviating from the performance of such duty of his, wilfully threw expended cartridge cases away towards Naka Sakai and Hideharu Onozeki, and, thus inviting them to come near to him, he fired towards them. Therefore, the incident is not considered to have arisen out of an act or omission done in the performance of official duty."

Discussions in the Criminal Jurisdiction Subcommittee of the Joint Committee.

At the same time the following exchange occurred:

U. S.: Do you agree that Girard was on duty as a guard, and that the incident arose while he was on such duty?

Japan: We admit that he was on duty, but it is our position that the shooting had no connection with his duty of guarding the machine gun. The act of Girard in

throwing out brass and enticing the victim toward him had no connection with guarding the machine gun.

U. S.: Your statement of fact does not take into account Girard's statement of his intent. That is, that he fired for the purpose of scaring the Japanese away and thus insure the safety of the machine gun.

Japan: The evidence shows that there was no danger to the Machine gun. Nickel made a statement to this effect. Thus, we do not consider that Girard actually fired to protect the machine gun. The Japanese were only picking up brass in the vicinity; they were not interfering in any way with Girard's mission to guard the machine gun. There was thus no necessity or reason for Girard to shoot at them to insure the safety of the machine gun. Its safety was never in danger. Further, according to the statement of Lt. Mahon, firing an empty cartridge from a grenade launcher is not authorized, and any superior of Girard's observing such an action by Girard would have been obliged to interfere and prevent Girard from firing his weapon in this manner.

U. S.: However, if we give full weight to Girard's statement, we must conclude that he did, in fact, fire to scare the Japanese away and thus insure safety of the machine gun. He may have been mistaken in believing that it was necessary to act in this manner, but we cannot escape the fact that, according to his own statement, he fired for this purpose. If you were to believe Girard's statement, would you consider that he was acting in the performance of official duty?

Japan: Your question is based on a supposition that is not supported by the evidence, and we are not prepared to answer it.

U. S.: In determining official duty in this case, is it not important to consider Girard's intent as disclosed by his own statement?

Japan: In determining that the incident did not arise in the performance of official duty, we considered all the

evidence. A number of Japanese witnesses were interrogated immediately after the incident. We considered their testimony as well as the testimony of Girard and Nickel. In determining Girard's intent, it is necessary to consider all the evidence, not just his version of the incident. When all of the evidence is considered, it appears that Girard's statement that he fired to scare the Japanese away and thus protect the machine gun is not worthy of belief, as the weight of the evidence contradicts Girard's statement. It is our position that the evidence shows that the firing had no significant connection with the guarding of the machine gun.

### Investigation of the Incident.

Investigations of the facts relating to the alleged offense were conducted by both the U. S. Army in Japan, and the local Japanese authorities.

### Interpretation of "Official Duty".

The following interpretation of the term "official duty" appears in a circular of the United States Army Forces, Far East which was published in January 1956:

"The term 'official duty' as used in Article XVII, Official Minutes, and the Agreed Views is not meant to include all acts by members of the armed forces and civilian component during periods while they are on duty, but is meant to apply only to acts which are required to be done as a function of those duties which the individuals are performing. Thus, a substantial departure from the acts a person is required to perform in a particular duty usually will indicate an act outside of his 'official duty.' "

### Action in the Joint Committee.

As a result of lengthy discussions extending from early March to mid-May 1957, it was finally agreed in the Joint Committee that the United States military authorities

would notify the appropriate Japanese authorities, in accordance with paragraph 3c of Article XVII of the Administrative Agreement, that the United States had decided not to exercise jurisdiction in the case. This action was thereafter taken.

The Action of the Secretary of Defense and the Secretary of State.

On June 4, 1957 the Secretary of State John Foster Dulles and Secretary of Defense Charles E. Wilson announced that after careful review of all available facts in the case, they had concluded that the Joint Committee's agreement that Girard be tried in the courts of Japan was reached in full accord with procedures established by the Treaty and Agreement, and that in order to preserve the integrity of the pledges of the U. S., this determination by the Joint Committee must be carried out.

Present Status of Girard.

At the present time Specialist 3/C Girard is administratively restricted to the limits of Camp Whittington.

Girard voluntarily enlisted in the Regular Army on October 28, 1954 for a three year term which will expire on October 27, 1957.

/s/ ROBERT DECHERT

ROBERT DECHERT
General Counsel
Department of Defense

Subscribed and sworn to before me this 8th day of June 1957.

My commission expires: March 6, 1961.

(SEAL) /s/ LAURA E. LITCHARD

NOTARY PUBLIC

544

## APPENDIX B.

### JOINT STATEMENT OF
### SECRETARY OF STATE, JOHN FOSTER DULLES
### and
### SECRETARY OF DEFENSE, CHARLES E. WILSON

The case of U. S. Army Specialist 3rd Class William S. Girard has far-reaching implications, involving as it does the good faith of the United States in carrying out a joint decision reached under procedures established by treaty and agreement with Japan.

The case involves actions by Girard which caused the death of Naka Sakai, a Japanese woman, on January 30, 1957. The issue arose as to whether or not Girard should be tried by U. S. court-martial or by a Japanese court. After careful deliberation in the Joint U. S.-Japan Committee established by the two Governments pursuant to treaty arrangements, the U. S. representative on this Committee was authorized to agree, and on May 16, 1957, did agree, that the United States would not exercise its asserted right of primary jurisdiction in this case. In view of this completed action, attempting to prolong the dispute over the jurisdictional issue would create a situation which could basically affect U. S. relations not only with Japan, but also with many other nations.

For these reasons, Secretary of State John Foster Dulles and Secretary of Defense Charles E. Wilson have carefully reviewed all the available facts in the case. They have now concluded that the Joint Committee's agreement that Girard be tried in the courts of Japan was reached in full accord with procedures established by the Treaty and Agreement, and that in order to preserve the integrity of the pledges of the United States, this determination by the Joint Committee must be carried out.

.        .        .        .        .

The Secretaries' review disclosed the following:

The incident occurred in a maneuver area provided by the Japanese Government for part-time use of United States forces. The Japanese Defense Force uses the same area about 40% of the time. When the area is not in use by either the United States or Japanese armed forces, Japanese civilians are permitted to farm or otherwise use the area.

Efforts to keep civilians away from the area during such military exercises have not proved effective. In this particular case, red boundary flags were, as customary, erected as a warning to civilians to keep off, and local authorities were notified of the proposed exercises. But, as was frequently the case, a number of Japanese civilians were in the area gathering empty brass cartridge cases at the time of the incident. These civilians had created such a risk of injury to themselves in the morning exercises when live ammunition was used that the American officer in charge withdrew live ammunition from the troops prior to the afternoon exercises. In the interval between two simulated attacks during the afternoon, Girard and another soldier, Specialist 3rd Class Victor M. Nickel, were ordered by their platoon leader, a Lieutenant, to guard a machine gun and several field jackets at the top of a hill. Girard and Nickel were not issued live ammunition for this duty.

It was while these soldiers were performing this duty that the incident occurred. Mrs. Naka Sakai, a Japanese civilian, died a few moments after being hit in the back by an empty brass rifle shell case fired by Girard from his rifle grenade launcher. She was not over 30 yards from Girard and was going away from him when he fired the rifle. Girard had previously fired similarly in the vicinity of a Japanese man, who was not hit.

Girard's action in firing empty shell cases from the rifle grenade launcher was not authorized. He asserted

that he fired from the waist, intending only to frighten the Japanese civilians. Others stated, but Girard denied, that empty shell cases were thrown out to entice the Japanese to approach.

.        .        .        .        .

Under the U. S.-Japanese Security Treaty and Article XVII of the Administrative Agreement under that Treaty, as established by the Protocol adopted September 23, 1953, the authorities of Japan have the prior right to jurisdiction to try members of the United States armed forces for an injury caused to a Japanese national, unless such injury is one "arising out of any act or omission done in the performance of official duty."

The Japanese authorities have taken the position that Girard's action in firing the shell cases was outside the scope of his guard duty and was, therefore, not "done in the performance of official duty."

The Commanding General of Girard's division certified that Girard's action was done in the performance of official duty.

In accordance with the procedure established under the Treaty and Administrative Agreement, the disputed matter was, on March 7, 1957, taken before the Joint U. S.-Japan Committee established under the provisions of the Treaty and Administrative Agreement previously referred to.

Various meetings were held between the United States and Japanese representatives on the Joint Committee. As is customary, a representative of the American Embassy in Tokyo also attended these meetings in the capacity of observer. Both sides continued to press their respective claims to primary jurisdiction, and the Committee was unable to reach agreement.

The Commanding General, Far East Command, reported the facts to the Department of the Army, the

executive agent for the Department of Defense. The Department of Defense considered having the Joint Committee refer the matter in dispute to the two Governments for settlement, but rejected this procedure as inadvisable under the circumstances. Department of Defense instructions were accordingly issued, through the Department of the Army, to the Far East Command to the effect that the U. S. representative on the Joint Committee should continue to press the claim for jurisdiction, but that, in case of continued deadlock, he was authorized to waive jurisdiction to Japan. After three weeks of additional negotiations, the U. S. representative waived jurisdiction in the name of the United States.

Girard was subsequently indicted by the Japanese judicial authorities for causing a death by wounding—the least serious homicide charge for which he could have been indicted under Japanese law. In determining whether Girard's actions were in violation of law, all the facts, as presented by both sides, must now be weighed by the Japanese court, just as they would by a U. S. court-martial, if trial were held under U. S. jurisdiction.

In accordance with Public Law 777 of the 84th Congress, the United States Government will pay for counsel chosen by Girard to defend him in this trial. Pursuant to the Administrative Agreement under the Japanese Treaty, Girard will be guaranteed a prompt trial, the right to have representation by counsel satisfactory to him, full information as to all charges against him, the right to confront all witnesses, the right to have his witnesses compelled to attend court, the right to have a competent interpreter, the right of communication with United States authorities, and the presence of a United States representative as an official observer at the trial. This observer is required to report to United States authorities on all aspects of the trial and the fairness of the court proceedings.

548

The U. S. authorities will, of course, see that all evidence is available to Girard and his counsel, and will render every proper assistance to him and his counsel in protection of his rights.

.        .        .        .        .

United States troops are stationed in many countries as part of our own national defense and to help strengthen the Free World struggle against Communist imperialism. The matter of jurisdiction in cases of offenses against the laws of host countries, whether by our servicemen abroad or by servicemen of other countries in the United States, is dealt with by mutual agreements.

In the operation of this system in Japan there has been the greatest measure of mutual trust and cooperation. Since the present arrangement became effective in October 1953, Japan, in the overwhelming majority of the cases in which it had primary right to try American personnel, has waived that right in favor of U. S. action. There is every reason to believe that trial of U. S. Army Specialist 3rd Class William S. Girard in the Japanese courts will be conducted with the utmost fairness.