The **UNITED STATES** of America ex rel. Terrence **STONE**, Appellant,

v.

William B. **ROBINSON**, Warden of the Allegheny County Jail, Charles S. Greenhill, Sergeant in Charge of the Pittsburgh Office of the United States Air Force Military Police, Robert C. Seamans, Jr., Secretary of the Air Force of the United States, and Melvin Laird, Secretary of Defense of the United States.

No. 18489.

United States Court of Appeals, Third Circuit.

Argued March 20, 1970.

Decided May 26, 1970.

Rehearing Denied June 16, 1970.

H. David Rothman, Pittsburgh, Pa., for appellant.

Blair A. Griffith, Asst. U. S. Atty., Pittsburgh, Pa., for appellees.

Before McLAUGHLIN, FREEDMAN and GIBBONS, Circuit Judges.

## OPINION OF THE COURT

GERALD McLAUGHLIN, Circuit Judge.

Appellant, an alleged deserter from the United States Air Force, appeals from an order of the United States District Court for the Western District of Pennsylvania denying his petition for a writ of habeas corpus.

Terrence Stone was arrested on September 27, 1969, on desertion charges and was incarcerated. On appeal he attacks the legality of his detention by Air Force authorities basically on the ground that his original four-year term of enlistment has long expired, and that the purported extensions of his enlistment were invalid. Appellant claims that if this writ does not issue to secure his release from military custody, the Air Force authorities will transport him to Japan, and turn him over to civilian Japanese authorities to serve a six-year sentence imposed by the Japanese judicial system.

It is undisputed that appellant enlisted in the United States Air Force on September 17, 1964, and that under ordinary circumstances, this term of enlistment would have expired on September 17, 1968. After certain assignments in the United States following his enlistment, on July 5, 1967 appellant was assigned to duty in Vietnam. After serving there approximately nine months, he was allowed a six day Rest and Recouperation Leave (R & R), commencing on March, 5, 1968. Stone, voluntarily, used his R & R in Japan, and was scheduled to report back to the military upon the completion of his leave at 2400 hours, March 11, 1968. He was to board a flight departing from Japan at 0200 hours, March 12, 1968. Stone failed to report back, and his duty status then changed to Absent Without Leave (AWOL) for 19 days until March 29, 1968, when he was returned to military control at Tachikawa Air Force Base, Japan. He was charged with various offenses related to his AWOL time, and was convicted by a General Court-Martial and sentenced to confinement at hard labor for 60 days. He was actually confined for a period of 50 days from October 19, 1968 to December 7, 1968.

On March 30, 1968, the Government of Japan notified the United States Air Force that Stone was alleged to have robbed and attempted to rape a Japanese woman on March 27, 1968 in Tokyo; this was during the time period when appellant was AWOL. On April 26, 1968, the Japanese Ministry of Justice notified the Government of the United States that Japan would exercise its criminal jurisdiction over Stone's case.[1] Airman Stone, though remaining in military control, was made available to the Japanese Government pursuant to Article XVII 5(c) and the Agreed Minute thereto of the Status of Forces Agreement between the United States and the Government of Japan.[2]

1. The crime of attempted rape is deemed most serious in the Asian Japanese culture. See, Ward, "Criminal Law and Jurisdiction over American Servicemen in Japan", 52 A.B.A.J. 61, 63 (1966).

2. Following World War II, the United States found itself in the position where for substantial periods its peacetime armies were to be stationed on foreign lands. Difficult and on occasion delicate

Appellant was subsequently tried on a robbery-attempted rape indictment in accordance with Japanese procedure by a three-judge judicial panel at seven sessions of the Tokyo District Court on June 26, July 10, July 12, July 17, July 23, September 11 and September 18, 1968.[3] At that trial, petitioner was represented by counsel, members of the Tokyo Bar, paid by the United States Government. Interpreters also were present.

Appellant Stone was advised of his right to remain silent as to the charges against him, but waived this right and testified in his own behalf. Stone admitted the robbery, but denied the attempted rape charge. The victim testified in detail about the incidents of the charges against Stone. Another Airman, Stone's companion on the day of the offense, who was likewise AWOL, also testified. On September 18, 1968 the Court found Stone guilty of both robbery and attempted rape. Stone was sentenced to six years imprisonment, and forfeiture of the knife which Stone had used to intimidate the victim.[4] Although there is no verbatim transcript of the trial, the United States Ambassador had trial observers present, and their report is part of this record.

On April 14, 1969, the Tokyo High Court affirmed the conviction and sen-

---

problems flowed from the presence of so many Americans abroad, some of whom committed crimes. The Status of Forces Agreement approach was a unique solution to those situations and a "novel legal experiment". See, Snee and Pye, Status of Forces Agreements and Criminal Jurisdiction 10 (1957).

The present Status of Forces Agreement with Japan, TIAS 4510, was entered into on June 19, 1960 (pursuant to Article VI of the Treaty of Mutual Cooperation and Security with Japan). Its provisions are very similar to the provisions of the 1953 Agreement which the Supreme Court had before it in Wilson v. Girard, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957). In Girard, the Court noted the doctrine of the landmark case of The Schooner Exchange v. M'Fadden, 11 U.S. (7 Cranch) 116, 3 L.Ed. 287 (1812) that "a soverign nation has exclusive jurisdiction to punish offenses against its laws committed within its borders, unless it expressly or impliedly consents to surrender its jurisdiction." Girard, at 529, 77 S.Ct. at 1411. The Status of Forces Agreement actually is a Japanese cession to the United States of criminal jurisdiction in certain cases. In Girard, a waiver provision of the Status of Forces Agreement was under consideration; the Court found "no constitutional or statutory barrier" to the application of the provision therein concerned. At 530, 77 S.Ct. 1409.

3. Trial by jury is unique to common law countries, and though Japanese jurisprudence has borrowed heavily from both civil law and common law traditions, "It is * * * perhaps fair to generalize that, from the point of view of official rules, institutions, * * * the Japanese legal system is closer to the civil law than to the common law." von Mehren, "Some Reflections on Japanese Law", 71 Harv.L.Rev. 1486, 1491 (1958). Trial by jury is one of the common law institutions not now utilized in Japan. Abe, "Criminal Justice in Japan", 47 A. B.A.J. 555 (1961).

4. One commentator has made the following pertinent remarks (describing another serviceman's attempt rape case) on the nature of the Japanese judicial system.

"The American serviceman who faces Japanese justice need have no qualms about the procedure. The safeguards are present and the people who handle the system are well-trained. In fact, the American accused often receives greater understanding and leniency from the experienced Japanese judge than he would from a court martial conducted by his fellow countrymen." Ward, supra, 63.

* * * * *

"The two judge advocates who were appointed by the American Ambassador to observe the trial read extensively in preparation. They learned that the necessary proof of attempted rape in Japanese courts differs little, if at all, from that required in America." Id. at 64.

Koya Matsuo, Associate Professor of Law at the University of Tokyo, in a recent article also pointed out that "* * * constitutional guarantees in Japan for defendants in criminal cases are similar to those in the United States." Matsuo, "Criminal Justice Administration in Japan", 9 Trial Judge's Journal 33 (1970).

tence, and on August 29, 1969 the Supreme Court of Japan, that nation's highest and final judicial tribunal, also affirmed. Throughout that period appellant remained in military control, though his only confinement was for 50 days on the AWOL charge. On September 12, 1969, subsequent to the Supreme Court of Japan's affirmance of his conviction, Stone again went AWOL, and via commercial airline transportation left Japan and went to his home in Pennsylvania at his own expense. On September 19, 1969, desertion charges—on which his last arrest and present confinement is based—were brought against him pursuant to Article 85, Uniform Code of Military Justice, 10 U.S.C.A. §§ 802 and 885.

The sole question for decision is whether or not appellant's enlistment extensions were valid. If they were not, Stone was not a member of the Armed Forces when he left Japan, the desertion charges against him must fall, his detention is illegal and the writ of habeas corpus should have been issued. Appellant's attack upon his enlistment extensions in this Court is two-pronged. First, he alleges that he was coerced into extending his enlistment. Second, he asserts that his enlistment extension papers were not properly verified.

His contention that he was coerced into extending his enlistment is a factual problem, involving credibility, and was examined by the district court. The court below heard appellant's testimony on October 3, 1969, and on October 29, 1969. Stone testified, in effect, that he was forced to sign the enlistment extension papers by threats that if he did not, he would be immediately discharged and turned over to the Japanese Government as a civilian to face the robbery and attempted rape charges. Tr. 9–14, October 3, 1969. This is the essence of Stone's coercion claim. In addition to his testimony on this issue, the court below had before it the affidavits of: (1) Technical Sergeant Bernard Marvel, dated October 6, 1969; (2) Major A. G. MacKeen, dated October 8, 1969; and

(3) former Captain D. J. Cooke, dated October 8, 1969. These affiants denied that any force or threats were used to cause Stone to extend his enlistment. From the evidence the trial judge was convinced that Stone elected to extend his enlistment in order to gain the benefits afforded to a member of the Armed Forces charged with crime by Japanese civil authorities; e. g. counsel provided by the military, and detention by the Armed Forces versus pre-trial confinement in a Japanese jail. The court specifically found:

"I * * * give no credibility to the petitioner in his statements that he was coerced into the signing of these extensions for his original term of enlistment." United States ex rel. Stone v. Robinson et al., 309 F.Supp. 1261, 1265 (W.D.Penn., 1970).

\* \* \* \* \* \*

"* * * I conclude that his choice of custody with the Armed Forces as against commitment to a jail in Japan was a voluntary act willingly done for his own benefit." Id. at 1268.

The standard of review that this Court must follow in this habeas corpus claim where factual determinations were made below is the same as that governing our review of other civil matters tried to the district court without a jury; i. e., under Rule 52(a), Fed.R.Civ.P., 28 U.S.C.A., the findings of the court below will not be set aside unless they are "clearly erroneous." Monnich v. Kropp, 408 F.2d 356 (6 Cir.1969). Applying this test to the circumstances before us, we would not be justified in setting aside the district court's conclusion that Stone was *not* coerced into extending his original four-year enlistment.

Appellant's contention that his enlistment extension papers were not properly executed is also without merit. That argument is to be considered in the light of the district court's determination that Stone, of his own volition, elected to extend his enlistment so that he could reap the advantages which—

pursuant to agreement with our Government and the Government of Japan—a member of the United States Armed Forces charged with crime in the Japanese civilian courts has over an ordinary foreigner charged with crime in Japan.

On August 27, 1968, appellant executed his first application to extend his four-year enlistment (which the court below held would have otherwise expired on September 17, 1968) for a period of two months. The reason given on the standard form, signed by Stone in two places, for that requested extension was for the purpose of "obtaining retainability for completion of trial by civil authorities." On November 7, 1968, May 16, 1969, and September 9, 1969, re-extensions totalling an additional 12 months were asked for by Stone, and subsequently approved, on similar forms; those forms contain the same language as to the reason or purpose for the extension. With those extensions plus an additional 69 days "bad time",[5] appellant's enlistment, the Government urges, had not yet expired at the time of appellant's unauthorized departure from Japan.

The district court found that, in effect, the extensions were not sworn to by Airman Stone as called for by Air Force Regulations, but that even so, such defect was not fatal. We agree with the district court's conclusion. Section 509 of Title 10, U.S.C.A., enacted on January 2, 1968 (81 Stat. 755) prior to appellant's first extension, authorizes the Secretaries of the respective armed service branches to provide for, by regulation, extensions and re-extensions of the term of enlistment for a member of the Armed Forces for any period, the sum of such extensions not to exceed four years. The statute's sole requirement of importance to the issue before us is that such extensions be implemented with the enlistees' "written

consent". There is no mandate in the statute that the execution of extension papers be under oath. No question was raised by appellant regarding the genuineness of his signature on each of the four extension papers in question.

■ Pursuant to 10 U.S.C.A. § 509, the Secretary promulgated AFM 35–16(13–1), Chapter 13, Special Instructions (Extensions of Enlistments). Subsection (c) provides that after an extension has been approved, it is to be "* * * executed by the airman and sworn to before a person * * * authorized to administer oaths * * *." The section of the extension form to which the enlistee must swear reads as follows:

"I HAVE THIS DATE VOLUNTARILY EXTENDED MY ENLISTMENT FOR A PERIOD OF MONTHS, I FURTHER ACKNOWLEDGE I HAVE BEEN FULLY COUNSELED ON THE CONDITIONS OF THIS EXTENSION AND THAT FAILURE TO CANCEL AN EXTENSION UPON ETS FOR THE PURPOSE OF IMMEDIATE REENLISTMENT WILL DEFER PAYMENT OF TRAVEL PAY AND CASH SETTLEMENT FOR UNUSED LEAVE UNTIL EXPIRATION OF THE EXTENSION PERIOD. HOWEVER, IF THE EXTENSION IS FOR LESS THAN ONE YEAR, I MAY ELECT CASH SETTLEMENT FOR UNUSED LEAVE, OR DEFER SETTLEMENT UNTIL DOS."

A plain reading of this language indicates that even if it were to be assumed that appellant did not swear to this acknowledgement in accordance with the Regulation, that would not be harmful to appellant as the benefit of this acknowledgement, concerning postponement of travel pay and cash settlement for un-

5. "Bad time", provided for in 10 U.S.C.A. § 972, refers to the amount of time an enlistment must be extended if, inter alia, an enlisted man absents himself for more than one day without proper authority or is confined more than one day pursuant to a final sentence.

used leave, runs to the Air Force and not to the enlistee. Certainly, any routine failure of appellant to swear to his execution of his extension form would not affect the validity of the enlistment extension, just as the violation of every regulation in some particular does not always invalidate the action taken thereunder. If the Regulation in this instance was not complied with in the respect indicated, appellant was not prejudiced in any way. In re Grimley, 137 U.S. 147, 11 S.Ct. 54, 34 L.Ed. 636 (1890); United States v. Spiro, 384 F. 2d 159 (3 Cir. 1967). Appellant, the district court decided, voluntarily sought to extend his enlistment on several occasions, did so, and received the benefits incident to those extensions. He cannot now be heard to complain that he failed to comply with some unimportant particular in executing his extensions.

We hold that the district court properly determined that appellant's extensions of his original enlistment are valid; that appellant's unauthorized departure from Japan subjected him to arrest; that his detention by Air Force authorities is legal; that the application for a writ of habeas corpus was properly denied.

The order of the district court will be affirmed.

## ON REHEARING

Before HASTIE, Chief Judge, McLAUGHLIN, FREEDMAN, SEITZ, VAN DUSEN, ALDISERT, ADAMS and GIBBONS, Circuit Judges.

PER CURIAM.

■ In his petition for rehearing appellant contends that this Court misunderstood the prime issue on appeal. To the contrary, however, petitioner misconstrues the nature of habeas corpus relief, a limited collateral remedy. The main question in this case is, as indicated in our opinion, p. 548, whether or not Stone was being illegally detained by Air Force authorities.

■ Appellant now contends that the issue of the sufficiency of the evidence was crucial and that we ignored this point. To the contrary, in note 4 of the opinion we cited authority to the effect that " * * * the necessary proof of attempted rape in Japanese courts differs little, if at all, from that required in America." Further, we stated that Stone, the victim, and Stone's companion all testified to what had happened.[1] Stone argues in effect that his version of the incident, his credibility, should have been completely accepted and therefore that he should have been acquitted. Even if this matter had been a *direct* appeal, Stone's credibility was a question of fact and properly so resolved in the trial court.

■ One further comment should be made. Petitioner suggests, citing a treatise relying on a case originating in Mexico in the early 1900's, that the administration of justice in Japan is so estranged from our notions of due process that this Court should ignore Stone's Japanese conviction, affirmed on appeal. Suffice to say any attempted analogy between the notion of justice in Mexico in the troubled early 1900's and modern-day Japan is, to say the least, frivolous.[2]

The petition for rehearing is denied.

1. There is no verbatim transcript of the trial that we might have examined, just the report of American observers.

2. Our opinion in this case pointed out the strong similarities of Japanese criminal justice and civil law and common law criminal jurisprudence.