In re the Extradition of Hermine RYAN (nee Braunsteiner), a fugitive from the justice of the Federal Republic of Germany.

No. 73–C–391.

United States District Court, E. D. New York.

May 1, 1973.

Robert A. Morse, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., for United States of America; Mary Maguire, Asst. U. S. Atty., of counsel.

Barry, Barry & Barry, Long Island City, N. Y., for Hermine Ryan (nee Braunsteiner); John J. Barry, Long Island City, N. Y., of counsel.

## MEMORANDUM OF DECISION AND ORDER

MISHLER, Chief Judge.

The United States Attorney, upon the request of the Federal Republic of Germany (Germany) made to the Secretary of State, initiated this extradition pro-

**272**

ceeding for the surrender of the detainee Hermine Braunsteiner Ryan to Germany (18 U.S.C. § 3184).[1] The request is based on an extradition treaty signed in Berlin on July 12, 1930, which treaty by its terms became effective April 26, 1931.[2]

The detainee is charged under §§ 211, 47 and 74 of the German Penal Suit Code[3] with multiple crimes of murder from October 1942 until March 1944 while she was an S.S. Supervisory Warden assigned to the Lublin concentration camp in Poland. These criminal stat-

utes were in effect during the period of the National Socialist regime and at the time the alleged crimes were committed. The penalty at that time was death. The penalty at this time is life imprisonment. No defense under German law is available based upon a claim of carrying out secret "Fuehrer's orders" in violation of German law. Certification by Judge Halbach, Presiding Judge, Duesseldorf District Court, dated April 9, 1973.

 Various defenses are raised. Only two warrant discussion.[4] Mrs.

1. Fugitives from foreign country to United States

Whenever there is a treaty or convention for extradition between the United States and any foreign government, any justice or judge of the United States, or any magistrate authorized so to do by a court of the United States, or any judge of a court of record of general jurisdiction of any State, may, upon complaint made under oath, charging any person found within his jurisdiction, with having committed within the jurisdiction of any such foreign government any of the crimes provided for by such treaty or convention, issue his warrant for the apprehension of the person so charged, that he may be brought before such justice, judge, or magistrate, to the end that the evidence of criminality may be heard and considered. If, on such hearing, he deems the evidence sufficient to sustain the charge under the provisions of the proper treaty or convention, he shall certify the same, together with a copy of all the testimony taken before him, to the Secretary of State, that a warrant may issue upon the requisition of the proper authorities of such foreign government, for the surrender of such person, according to the stipulations of the treaty or convention; and he shall issue his warrant for the commitment of the person so charged to the proper jail, there to remain until such surrender shall be made.

2. The Secretary of State certified that the treaty is in full force and effect.

3. § 211 provides in part:
(a) A murderer is, who kills a person out of blood-thirstiness, for the satisfaction of sexual desire or instinct, out of covetousness or greed or for other primitive motives, either in a malicious or cruel manner or by means danger-

ous to the community or in order to cover or hide or make possible and allow for another crime.
§ 47 of Penal Suit Code:
If and when several people jointly commit a crime, each of the perpetrators shall be sentenced individually.

4. In addition to the two defenses discussed, Mrs. Ryan claims:
(1) That she is an American citizen whose extradition is barred under Article II of the Treaty. This claim was denied in a memorandum of decision dated April 24, 1973, under docket No. 68–C–848, D.C., 360 F.Supp. 265.
(2) That the extradition treaty is not in effect. This claim is denied on the certification of the Secretary of State dated April 4, 1973. At the time that the offenses were committed a state of hostilities existed between the Contracting Powers. It has been said that an extradition treaty between warring powers is suspended. Argento v. Horn, 241 F.2d 258 (6th Cir. 1957); In re Extradition of D'Amico, 177 F.Supp. 648 (S.D.N.Y.1959); Gallina v. Fraser, 177 F.Supp. 856 (D.Conn.1959), aff'd 278 F.2d 77 (2d Cir. 1960). It is, however, the status of the relations between the demanding nation and the asylum nation at the time of the demand that is determinative of whether or not extradition will be allowed. United States ex rel. Oppenheim v. Hecht, 16 F.2d 955 (2d Cir. 1927). "[W]here the offenses were committed during a period of suspension . . . extradition will be allowed when the treaty is revived." Gallina v. Fraser, supra 177 F.Supp. at 864.
(3) That she is not a "fugitive" within the meaning of the Treaty because she did not flee Germany to avoid prosecution. This claim is denied on the reasoning of United States ex rel. Eates-

Ryan claims (1) lack of evidence of probable cause and (2) that a judgment by the County Court for Criminal Cases, Vienna, sitting as a People's Court, dated November 22, 1949, convicting and acquitting her of certain "war crimes," bars extradition for the charges set forth in the Extradition Bench Warrant.

### 1. *The Claim of Lack of Probable Cause*

Mrs. Ryan's argument apparently is that because there is no eyewitness testimony to killings (statement of Mr. Barry at oral argument on April 24, 1973, tr. p. 6) there is insufficient evidence of criminality under Article I of the Treaty to justify her extradition. The claim is spurious.

▮▮▮ The extraditing magistrate's function is to determine whether there is any evidence sufficient to establish reasonable or probable cause to believe that the detainee committed the crimes charged. Fernandez v. Phillips, 268 U. S. 311, 45 S.Ct. 541, 69 L.Ed. 970 (1925); Shapiro v. Ferrandina, 478 F. 2d 894 at 905 (2d Cir. 1973). Article X specifies the nature and competency of the evidence to be considered.[5] Further, 18 U.S.C. § 3190 provides that:

"[d]epositions, warrants, or other papers or copies thereof . . . shall be received and admitted as evidence . . ." in extradition hearings.

The depositions supporting the Extradition Bench Warrant were made by former inmates of the concentration camp. They give eyewitness accounts in minute detail of Mrs. Ryan's participation as a supervising warden in the alleged mass murders committed periodically at the camp. These former inmates say that Mrs. Ryan actively assisted in the macabre "selections" that consigned women, children, elderly and others to the gas chambers. Eyewitnesses Danuta Czaykowska-Medryk and Boleslawa Janiszek state that she supplied candidates for extermination on her own when she felt that they had been overlooked by the selecting officer. The deposition of Lucyna Domb describes a brutal, unprovoked assault on a female inmate who died the next day. The deposition of Maria Kaufmann-Krasowski describes the hanging of a young girl in September, 1943. It states that Mrs. Ryan ordered her to stand on a stool to be hung by S.S. guards. The deposition states that this young Jewish girl hoped to avoid the gas chamber by claiming Polish parentage. As an object lesson, the other inmates were ordered to witness the hanging. One of those on-lookers was Maria Kaufmann-Krasowski.

There is competent and sufficient evidence to establish probable cause to believe that Mrs. Ryan committed each of the acts charged in the bench warrant. A determination of probable cause in an extradition proceeding may rest entirely upon hearsay. Shapiro v. Ferrandina, *supra*; *cf.* Costello v. United States,

sami v. Marasco, 275 F.Supp. 492, 496 (S.D.N.Y.1967).
(4) That the Lublin Concentration Camp (Majdanek) was not within the territorial jurisdiction of Germany. Article I of the Treaty defines "territorial jurisdiction" as territory "under the control of one of the High Contracting Parties . . ." This claim is denied.
(5) We note that Article IV of the Treaty bars consideration of the offenses as "political offenses."

5. Article X provides:
The arrest of the fugitive shall be brought about in accordance with the laws of the party to which the request is made, and if, after an examination, it shall be decided, according to the law and the evidence, that extradition is due, pursuant to this Treaty, the fugitive shall be surrendered according to the forms of law prescribed in such cases.
". . . If the fugitive criminal [is] . . . charged with a crime or offense, a duly authenticated copy of the warrant of arrest in the country where the crime or offense was committed shall be produced, together with the depositions upon which such warrant may have been issued, or such other evidence or proof as may be deemed competent in the case or both."

350 U.S. 359, 76 S.Ct. 406, 100 L.Ed. 397 (1956).

## 2. *The Double Jeopardy Claim*

▮ The double jeopardy claim must also fail. There is no constitutional right to be free from double jeopardy resulting from extradition to the demanding country. The fact that the full range of our constitutional protections will not be available to the detainee at her trial will not bar extradition. "Those provisions have no relation to crimes committed without the jurisdiction of the United States against the laws of a foreign country." Neeley v. Henkel, 180 U.S. 109, 21 S.Ct. 302, 45 L.Ed. 448 (1901); Holmes v. Laird, 148 U.S.App.D.C. 187, 459 F.2d 1211, 1217–1219 (1972). The extraditing court will not inquire into the procedures which await the detainee upon extradition; "the conditions under which a fugitive is to be surrendered to a foreign country are to be determined solely by the non-judicial branches of the Government." Gallina v. Fraser, *supra* 278 F.2d at 79. *Cf.* Wilson v. Girard, 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957), in which the Supreme Court did not consider the nature of the procedures in Japanese courts in refusing to enjoin the Secretary of Defense from turning over an American soldier for prosecution in Japan for crimes committed on Japanese soil.

The only Treaty reference to nonextraditability for an offense for which a fugitive may claim prior conviction or acquittal is found in Article VI.[6] That provision bars extradition where the fugitive has been convicted or acquitted in the asylum country.

Assuming arguendo that some protection against double jeopardy were available to the detainee, her reference to her conviction in Austria for "war crimes" and her acquittal on a charge of "war crimes"[7] is valueless. The judgment of conviction recites that Mrs. Ryan is guilty of having taken advantage of her official power as supervisor of the concentration camp at Ravensbruck (Germany) during the years 1941 and 1942 by injuring and offending the human dignity of inmates. The same court on the same day acquitted her of similar charges while acting as a supervising warden of the concentration camp at Majdanek (Lublin).[8]

---

6. "A fugitive criminal shall not be surrendered under the provisions hereof, when, from lapse of time or other lawful cause, according to the laws of the country where the fugitive shall be found, the criminal is exempt from prosecution or punishment for the crime or offense for which the surrender is asked, or when his extradition is asked for the same crime or offense for which he has been tried, convicted or acquitted in that country, or so long as he is under prosecution for that crime or offense." Treaty, Article VI.

7. The pertinent sections of the Austrian criminal statutes are denominated "War Criminals Act."

8. The charges were based on Sections 3 (1) and (2), and 4 of the War Criminals Act (KVG of 1947) which provide as follows:
Section 3. Tortures and mistreatments.
 (1) Who, at the time of the National Socialist reign of terror, for reasons of political hatred or using his official or other power, caused a human being a state of agony or severely mistreated him, shall be punished for a crime with 5 to 10 years in maximum security prison and if the deed resulted in serious detriment to that person's health, the penalty will be maximum security imprisonment for from 10 to 20 years.
 (2) If by the deed human dignity and the laws of humanity were grossly injured or it resulted in the death of the victim, the crime shall be punished by death.
Section 4. Violations against humanity and human dignity.
 Who, at the time of the National Socialist reign of terror out of political hatred or by utilizing his official or other powers, injured or insulted someone's human dignity, will receive a prison sentence for 1 to 5 years for a crime, if, however, the insults or injuries were especially serious and were often repeated, the penalty shall be maximum security

The Fifth Amendment right not "to be twice put in jeopardy of life or limb" is available only to prosecutions in this country. The essential elements of a plea of double jeopardy are identity of successive sovereigns, Abbate v. United States, 359 U.S. 187, 79 S.Ct. 666, 3 L.Ed.2d 729 (1959); Bartkus v. Illinois, 359 U.S. 121, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959); United States v. Feinberg, 383 F.2d 60 (2d Cir. 1967); United States v. Smith, 446 F.2d 200, 202 (4th Cir. 1971), and an identity of alleged offenses, United States v. Feinberg, *supra*. There is clearly no identity of sovereignty between Austria and the Federal Republic of Germany. The murder charges in this proceeding are not the charges of which Mrs. Ryan was acquitted in Austria.

The petition is granted. The court certifies to the Secretary of State that sufficient evidence has been presented in this hearing to sustain the charges set forth in the Extradition Bench Warrant dated March 6, 1973, issued by the Presiding Judge of the Duesseldorf District Court and that the charges contained therein are extraditable offenses, i. e. "Murder including the crimes designated by the terms assassination, manslaughter and infanticide." (Article III subd. 1), and it is further

Ordered that Hermine Braunsteiner Republic of Germany is made, and it is further

Ordered that surrender to the Federal Republic of Germany is stayed to May 4, 1973, at 2:00 P.M., to afford the detainee the opportunity to application for relief she deems appropriate in the premises.

prison from 5 to 10 years; if, however, the perpetrator, by disregarding human dignity and the laws of humanity, has brutally handled an individual, he will, for this crime receive a prison sentence of 5 to 10 years in maximum security

prison and if the deed resulted in serious detriment to that person's health, the penalty will be a maximum security prison term from 10 to 20 years. If the crime has caused the victim's death, the death penalty takes effect.