**Orville TAYLOR**

v.

**UNITED STATES of America,
Appellant.**

**No. 82–1452.**

United States Court of Appeals,
Third Circuit.

Argued May 31, 1983.

Decided June 21, 1983.

Rehearing and Rehearing In Banc Denied July 21, 1983.

Carter Phillips, Washington, D.C. (argued), Peter F. Vaira, Jr., U.S. Atty., Walter S. Batty, Jr., Asst. U.S. Atty., Chief of Appeals, Dawn MacPhee, Asst. U.S. Atty., Philadelphia, Pa., for appellant; Donal M. Hill, Commander, JAGC, U.S. Navy, Alexandria, Va., of counsel.

Stanley M. Shingles, Philadelphia, Pa., for appellee.

Before GIBBONS and BECKER, Circuit Judges, and WEBER, District Judge.*

* Hon. Gerald J. Weber, United States District Judge for the Western District of Pennsylvania, sitting by designation.

## OPINION OF THE COURT

GIBBONS, Circuit Judge.

The United States appeals from a judgment of the district court ordering the release of Orville Taylor from military custody and restraining the government from surrendering him to the government of Spain for service of a sentence. We affirm.

### I.

Mr. Taylor began a four year enlistment in the United States Navy in December 1973. He later executed a two-year voluntary extension of enlistment. Thus his term of voluntary enlistment was scheduled to terminate on December 30, 1979. In October of 1977, while Taylor was assigned to the naval base at Rota, Spain, he was involved in an off-base automobile accident which resulted in the death of a Spanish citizen. Pursuant to Policy Directive 110.5, Joint U.S. Military Group—Military Assistance Advisory Group, which implements the Agreement of Friendship and Cooperation between the United States and Spain of August 6, 1970, Mr. Taylor was immediately placed on legal hold status pending a decision as to whether he would be subject to the jurisdiction of the Spanish authorities. In that status, notice of which he acknowledged in writing on October 18, 1977, Taylor would not be transferred from or permitted to leave Spain without prior approval of the Commander, U.S. Naval Activities, Spain. The United States requested Spain to waive its right to exercise jurisdiction in favor of the United States, but Spain declined. Thus no military charges were pressed against Taylor. On August 7, 1978 he was criminally indicted by the Spanish authorities for involuntary manslaughter. Pursuant to Article XVIII of the January 24, 1976 Agreement in Implementation of the Treaty of Friendship and Cooperation, 27 U.S.T. 3095, 3116, T.I.A.S. No. 8361, the United States Naval authorities requested and were granted responsibility for Taylor's custody pending disposition of this charge. On July 16, 1979 Taylor was found guilty. Thereafter he was sentenced to eighteen months in prison and assessed civil damages of $15,500.00. Taylor appealed, but a Spanish appellate court affirmed his sentence.

Upon affirmance of the conviction on November 6, 1980 the Spanish authorities requested the United States Naval authorities to deliver Taylor on November 7, 1980 for service of his sentence. Meanwhile, however, the term of Taylor's extended voluntary enlistment had expired. He remained at the naval base at Rota and continued to receive military pay and benefits. There is a factual dispute over whether or not he requested a formal discharge, but it is undisputed that he was never formally discharged. Instead, the Navy authorized a voluntary extension of Taylor's term of enlistment, and, on January 22, 1980, he refused to execute it. Thereafter, the Navy purported, unilaterally, to extend the term of his enlistment involuntarily. That action was taken pursuant to Article 3840260(5)(h) of the Bureau of Naval Personnel Manual (BUPERSMAN) which reads:

> 5. Under certain conditions members may legally be retained beyond the date of expiration of enlistment or other period of obligated service, either voluntarily or involuntarily until discharge, release to inactive duty, or transfer to the Naval Reserve and release to inactive duty, is accomplished. When a member is retained in service beyond expiration of enlistment, or other period of obligated service, entry as to the reason and authority for the retention shall be made on the appropriate page of the member's service record and signed in accordance with this Manual. Enlisted members may be held beyond expiration of their enlistment or other period of obligated service for any of the following reasons:
>
> \*   \*   \*   \*   \*   \*
>
> h. As a result of apprehension, arrest, confinement, investigation, or filing of charges that may result in a trial by court-martial, and continues for all purposes of trial by court-martial and the execution of any sentence thereof. Further, it continues by reason of any of the aforementioned actions that are taken by civil authorities, that may result in trial, because of any offense committed within the criminal jurisdic-

tion of the civil authority concerned, by a member, prior to a legal discharge or separation, although the term of enlistment or obligated service may have expired. In those circumstances, the member may be retained in the service for trial and punishment by civil authorities after the member's period of obligated service would otherwise have expired. . . .

Before the Navy could turn Taylor over to the Spanish authorities he fled the country. The Spanish authorities issued a fugitive warrant,[1] and the Navy listed him as a deserter in violation of 10 U.S.C. § 885 (1976).

On May 24, 1982 the Richmond, Virginia police, checking Taylor's record after a traffic violation, discovered that he was sought as a deserter and turned him over to the Navy. He was transferred to the Navy Brig, Naval Station, Philadelphia, to await transfer to Rota and surrender to Spanish custody. On June 9, 1980 Taylor filed suit in the district court, alleging an unconstitutional detention and seeking injunctive and declaratory relief to prevent his return to Spain. The trial court issued a temporary restraining order, which was extended several times. On June 30 an evidentiary hearing was held, and on July 15, 1982 a final judgment was entered granting an injunction against Taylor's return to Spain and ordering his release. A panel of this court stayed the order for his release. Prior to the entry of the stay, however, Taylor posted bail and was released from physical custody by the Navy. A stipulation was subsequently executed by the parties and approved by the district court which provided that Taylor would remain free on bail in a leave without pay status from the Navy until a final ruling by this court.

## II.

The United States has three objections to the district court order, one procedural and two substantive.

### A. The Procedural Objection

■ The United States contends that the district court acted improperly when, following the June 30, 1982 hearing on Taylor's application for a preliminary injunction, the court proceeded to enter a final judgment. Although the trial court has authority to consolidate a hearing on an application for a preliminary injunction with the trial on the merits, Fed.R.Civ.P. 65(a)(2), it did not do so here and did not notify the parties in advance of its intention to render a final judgment. Here, however, the gist of the government's position is that it had legal authority to extend Taylor's enlistment involuntarily. It concedes that this issue is purely legal. Thus the trial court's procedure, while perhaps erroneous, was harmless and in no way prejudiced the government on that issue.

■ The government also contends, however, that it was prejudiced in presenting its factual claim that Taylor is estopped from challenging the Navy's authority to extend his enlistment involuntarily. The only disputed issue of fact the government has pointed to is the question of whether Taylor requested a formal discharge. Taylor says that he did, and that the Navy refused to process the request. The Navy denies that he made it. We conclude that this issue is not dispositive on any principle of estoppel.

It is undisputed that Taylor voluntarily refused to extend his enlistment and that the Navy acted unilaterally. The facts as to Taylor's conduct after the Navy acted unilaterally are undisputed. The Navy asserted its authority to detain him, and he drew pay during the period in which he submitted to that detention. When he lost his appeal, Taylor fled from Spain. These are the only facts relevant to the issue of involuntary extension, and they do not estop Taylor in this case.

Thus we can only set aside the trial court's actions in these respects if the United States can show that it was prejudiced

---

**1.** The Government of Spain is not a party, and so far as the record discloses there has been no request to the United States for extradition pursuant to the Treaty on Extradition, May 20, 1970, 22 U.S.T. 737, T.I.A.S. 7136, *amended by* Supplemental Treaty on Extradition, January 25, 1975, 29 U.S.T. 2283, T.I.A.S. 8938.

thereby in the presentation of a complete case. *E.g. Wohlfahrt v. Memorial Medical Center*, 658 F.2d 416, 418 (5th Cir.1981). Since the government can demonstrate no prejudice with respect to the development of the material facts, we cannot hold that the trial court erred in deciding the case on the basis of the record made at the June 30, 1982 preliminary injunction hearing, and thus we proceed to the merits.

### B. *The Substantive Objections*

#### 1. *The Involuntary Extension of Enlistment*

The government contends that Taylor is still an enlistee in the Navy because its unilateral involuntary extension of enlistment was lawful. That contention requires consideration of the several sources of authority on which the government places reliance.

#### a. *Title 10*

■ Under article I, section 8, clause 14 of the Constitution, Congress is given the power to "make Rules for the Government and Regulation of the land and naval Forces." This power has been exercised in title 10 of the United States Code which contains the now uniform laws applying to the various segments of the armed forces. Title 10 expressly authorizes involuntary extensions of enlistment by the military only once; enlistments in effect or entered into during a time of war continue until six months after such war, unless terminated by the President. 10 U.S.C. §§ 506, 671a (1976). Prior to the enactment of section 506 as part of the Armed Services Act of 1968, the Secretary of the Navy had discretionary authority to extend enlistments in time of war or national emergency for whatever period he considered necessary. Such authority was limited to time of war for the Secretaries of the Army and the Air Force, a limitation which the Department of Defense urged Congress to remove. Instead, in the sole substantive change made by the Armed Services Act, Congress chose to restrict the authority of all the Secretaries by permitting involuntary extensions of enlistments only in periods of war. S.Rep. No. 931, 90th Cong., 1st Sess., *re-printed in* 1967 U.S.Code Cong. & Ad.News 2635, 2636. In the event of a national emergency the President has limited authority to extend enlistments, but only when Congress is not in session and subject to subsequent Congressional approval. 10 U.S.C. § 671b (1976). No mention is made in title 10 of naval authority to involuntarily extend individual enlistments when a servicemember stationed in a foreign country is subject to that country's criminal jurisdiction. Thus no statutory authority supports the Navy's unilateral involuntary extension of Taylor's enlistment.

#### b. *The Treaty With Spain*

■ The government implicitly acknowledges the lack of express statutory provision for such extensions but contends that the necessary authority is derived from article XVIII of the Agreement in Implementation of the Treaty of Friendship and Cooperation of January 24, 1976 between Spain and the United States, 27 U.S.T. 3095, T.I.A.S. No. 8361, which states in part:

3. The custody of a member of the United States Personnel in Spain, who is legally subject to detention by the military authorities of the United States and over whom Spanish jurisdiction is to be exercised, shall be the responsibility of the United States military authorities, at their request, until the conclusion of all judicial proceedings, at which time the member will be delivered to Spanish authorities at their request for execution of the sentence. Nevertheless, at the conclusion of a trial at which the sentence of the court includes confinement for more than one year, the member shall, if ordered by the judge of the court, be delivered to the Spanish authorities for execution of the sentence even if the verdict of the trial is being appealed. During periods of custody by the United States military authorities, those authorities, within the legal powers given them by the military law of the United States, shall give full consideration to the decisions of the competent Spanish authorities regarding conditions of custody. The United States

military authorities shall guarantee his immediate appearance before the competent Spanish authorities in any proceedings that may require his presence and, in any case, his appearance at the trial.

27 U.S.T. at 3116–17.

Assuming that the agreement is an exercise of Congressional article I, section 8, clause 14 power,[2] the validity of the government's assertion depends on whether a servicemember such as Taylor whose term of enlistment has expired but who has not received a discharge is "a member of the United States Personnel in Spain [ ] who is legally subject to detention by the military authorities of the United States...." Under the terms of the Agreement, United States Personnel include military personnel that are stationed in or that visit Spain; civilian employees; employees of organizations which accompany the armed forces, such as the American Red Cross and the USO; and the dependents of any individuals in these categories. 27 U.S.T. at 3098–100. According to the government, the phrase "legally subject to detention" has both a descriptive and a substantive meaning. As to nonmilitary personnel, the phrase merely acknowledges that there must be a legal basis for detention independent of the treaty. As to military personnel, however, this phrase supposedly confers the substantive authority to detain servicemembers who are subject to Spanish jurisdiction. *See* Government Brief at 16–22.

Such a double reading runs counter to all normal rules governing the interpretation of contracts. The government attempts to bolster its argument by referring to the intent of the two parties—Spain and the United States—to this Agreement. Thus, the government points to the privileges and protections which the United States obtained for servicemembers subject to foreign jurisdiction in exchange for the obligation to surrender such members at appropriate times during the course of Spanish proceedings. As a result, according to the government, "[i]t is clear that neither the United States nor Spain contemplated that such obligation, once assumed, would be defeated by the mere expiration of the serviceman's term of enlistment...." Government Brief at 20. But this conclusion, whatever its validity as a statement of the parties' unarticulated intent, in no way follows from the quid pro quo which is evident in the language of article XVIII. The obligation to surrender a servicemember is not defeated by the expiration of a term of enlistment. The Navy must merely find another legally sufficient basis for detaining the member, or acknowledge its lack of authority and surrender the member to the Spanish authorities. Such a reading does not threaten the obvious intent of the United States to extend the privileges and protections of its custody to those who are subject to its jurisdiction and, unlike the government's reading, does no violence to the plain meaning of article XVIII.[3] The Navy could and probably should have surrendered Taylor to the Spanish authorities prior to the expiration of his voluntary enlistment. Article XVIII of the treaty justifies naval custody of servicemembers only when there is an independent legal basis for such detention. *See Amidon v. Lehman,* 677 F.2d 17, 19 (4th Cir.1982).

### c. *Implicit Navy Rulemaking Authority*

■ We next consider whether the validity of regulations such as BUPERSMAN

---

**2.** According to the government, under *Wilson v. Girard,* 354 U.S. 524, 77 S.Ct. 1409, 1 L.Ed.2d 1544 (1957), such power is exercised when, as here, the Senate ratifies a treaty with actual knowledge of the terms of the implementing agreement.

**3.** The government argues that even if article XVIII of the Agreement does not by itself authorize involuntary extensions of enlistment, the final article requires adoption of all measures necessary to implement the Agreement. 27 U.S.T. at 3144. Thus, it supposedly authorizes the adoption of BUPERSMAN article 3840260(5)(h). Government Brief at 22 n. 21. The final article, however, requires only that which is necessary to implement the Agreement and since, as indicated in the text, involuntary extensions of enlistment are not needed to effect the parties' intent, the BUPERSMAN article cannot derive its authority from this provision.

3840260(5)(h) which provide for involuntary extensions of enlistment can be derived from the Congressional delegation of authority to the Secretary of the Navy. 10 U.S.C. § 6011 (1982), which had its origins in the Act of July 14, 1862, ch. 164, § 5, 12 Stat. 565, provides that United States Navy Regulations shall be issued by the Secretary of the Navy. There is no statutory definition of Regulations, but the Explanatory Note to 10 U.S.C.A. § 6011 (1959) states that section 6011 covers "permanent regulations of general applicability falling within this statute" as opposed to "the many other regulations issued by the Secretary under specific statutes and under his power to administer the Department."[4] This definition is further expanded by 32 CFR § 700.1201 (1982) which describes the Regulations, 32 C.F.R. §§ 700.101–1202, as the principal regulatory document covering chain of command and responsibility. The BUPERSMAN article clearly does not fall within this category, and the Navy makes no such claim.

The Regulations, however, provide that Navy officers and officials may promulgate regulations concerning matters over which they have supervision and control. 32 C.F.R. § 700.1202. This is no more than a delegation of the Secretary's authority—recognized by Congress in 1981—to administer the Department of the Navy. Such authority does not provide a basis for the involuntary extension of enlistments, because Congress made clear in 10 U.S.C. § 503(b) (1982) that these regulations can only implement the Secretary's functions, powers and duties under title 10. As we have held in Part II. B. 1. a. of this opinion, title 10 gives the Secretary only limited power to extend enlistments, and the legislative history of this provision indicates an unwillingness to expand this authority. Thus, 32 C.F.R. § 700.1202 cannot be relied upon to establish the validity of the BUPERSMAN article.[5]

### d. *The Inherent Nature of an Enlistment Contract*

The government also argues that involuntary extensions of enlistment are permissible under the caselaw which defines the nature of enlistments. Like marriage, an enlistment is a contract which changes status. *In re Grimley,* 137 U.S. 147, 152, 11 S.Ct. 54, 55, 34 L.Ed. 636 (1890). The government points out that the breach or expiration of this contract does not result in automatic discharge. *Garrett v. United States,* 625 F.2d 712, 713 (5th Cir.1980), *cert. denied,* 450 U.S. 918, 101 S.Ct. 1363, 67 L.Ed.2d 344 (1981). "But [the enlistee] status does not invalidate the contractual obligation of either party or prevent the contract from being upheld, under proper circumstances, by a court of law." *Pfile v. Corcoran,* 287 F.Supp. 554, 556–57 (D.Colo. 1968). Thus, for example, while a soldier is barred by the *Feres* doctrine from recovering damages under the Federal Tort Claims Act for illegal detention, he is not "foreclosed from legal relief [such as habeas corpus] if held in the military after he has met all of the requirements for discharge." *Garrett v. United States,* 625 F.2d at 714.[6] *See also United States v. Hutchins,* 4 M.J. 190,

---

**4.** 10 U.S.C. § 6011 was amended in 1981 to eliminate the necessity for Presidential approval of Regulations. According to S.Rep. No. 146, 97th Cong., 1st Sess. 25–26, *reprinted in* 1981 U.S.Code Cong. & Ad.News 1484, 1509, the semantic distinction between Regulations and regulations is preserved.

**5.** In *Amidon,* the Fourth Circuit observed that under 32 C.F.R. § 700.1201, Navy Regulations cannot be amended by Navy regulations. Thus, the court found the BUPERSMAN article invaliid since it amended 32 C.F.R. § 730.4(e) which lists the various grounds for extending enlistments. As the government points out, the *Amidon* court erroneously assumed that 32 C.F.R. § 730.4(e) was a Navy Regulation; it was actually promulgated pursuant to the normal 32 C.F.R. § 700.1202 rulemaking power. The government's position is not aided by this point, however, if there is no authority for the BUPERSMAN article in the first place.

**6.** The *Feres* doctrine, however, does not bar the recovery of damages for illegal detention occurring after a soldier has been discharged from the service. *Valn v. United States Department of Defense,* 708 F.2d 116 (3d Cir.1983).

192 (C.M.A.1978); *United States v. Hout,* 19 C.M.A. 299, 41 C.M.R. 299 (1970); D. Schlueter, *Military Criminal Justice* § 4–8(A), at 128 (1982) (servicemember subject to the Code of Military Justice remains in the service after the expiration of his term of enlistment unless he satisfies the requirements for discharge or objects to his detention and the government fails to take appropriate action within a reasonable amount of time).

■ The government claims that Taylor never requested a discharge or that, at the very least, there is a factual issue as to whether this request was made. Apparently, the government would argue that those cases which require a servicemember to exhaust administrative remedies before resorting to the federal courts, *see, e.g., Emma v. Armstrong,* 473 F.2d 656 (1st Cir.), *cert. denied,* 414 U.S. 870, 94 S.Ct. 87, 38 L.Ed.2d 88 (1973), bar judicial review in this case. As noted by the Supreme Court, "[a]pplication of the [exhaustion] doctrine to specific cases requires an understanding of its purposes and of the particular administrative scheme involved." *McKart v. United States,* 395 U.S. 185, 193, 89 S.Ct. 1657, 1662, 23 L.Ed.2d 194 (1969). Within the context of military regulation, the exhaustion requirement ensures that the military, a highly specialized society with goals separate from those of the general community, *Schlesinger v. Councilman,* 420 U.S. 738, 757, 95 S.Ct. 1300, 1312, 43 L.Ed.2d 591 (1975); *Parisi v. Davidson,* 405 U.S. 34, 40, 92 S.Ct. 815, 819, 31 L.Ed.2d 17 (1972), will be able to perform those tasks—such as developing a factual record and applying its expertise—for which it is uniquely qualified. *Parisi v. Davidson,* 405 U.S. at 37, 92 S.Ct. at 817.[7] This rationale is particularly

valid when a case presents issues of fact as to whether a servicemember has acted reasonably in his pursuit of a discharge, *Emma v. Armstrong,* 473 F.2d at 658, or whether the government has acted reasonably in denying or ignoring the discharge request.

■ Such factual issues are not presented in this case, however. Whether or not Taylor formally requested a discharge, it is clear that he was opposed to his involuntary enlistment. It is also clear that the sole reason for his detention was that the Navy considered itself authorized *as a matter of law* to detain him beyond his enlistment term and that were Taylor to have pressed a formal discharge claim he would have been met at every stage by this legal argument. Since there is no additional factual record required for resolution of this issue and no arcane Navy regulation which must be explicated, there is no justification for judicial deference.[8]

### 2. Estoppel

■ Finally, the government argues that even if it lacks statutory, regulatory, or inherent authority to extend enlistments involuntarily, and even if the nature of the enlistment status is in itself an insufficient basis for detaining Taylor, his behavior was such as either to estop him from challenging this detention or to create an implied in fact enlistment contract. Under each theory, Taylor must have intended to act in such a way that the Navy could have reasonably believed that he assented to an extension of his enlistment. *See, e.g., United States v. Ruby Co.,* 588 F.2d 697, 703 (9th Cir.1978) (estoppel), *cert. denied,* 442 U.S. 917, 99 S.Ct. 2838, 61 L.Ed.2d 284 (1979); Restatement (Second) of Contracts § 19 (1981) (conduct

---

**7.** The exhaustion requirement is akin to but not the same as judicial reluctance to intervene in military court proceedings. The latter is based more on principles of deference to military jurisdiction rather than recognition of superior qualifications, and thus is analogous to federal abstention in cases involving state law. *See* Parisi v. Davidson, 405 U.S. at 40, 92 S.Ct. at

819; Emma v. Armstrong, 473 F.2d at 659 (Coffin, C.J., dissenting in part).

**8.** At no point in these proceedings has the government suggested that, prior to returning Taylor to Spain and surrendering him to the Spanish authorities, it would afford him an opportunity to present and exhaust his legal contentions in a court martial or elsewhere.

as manifestation of assent). To state this requirement is to rebut the government's argument. The extension of Taylor's enlistment was involuntary. Although Taylor initially explored re-enlistment, the Navy turned him down, insisting on voluntary extension. Even the government admits that by the time Taylor's enlistment expired he was clearly opposed to voluntary extension and to his continued detention. Given this opposition, Taylor's temporary acquiescence in the Navy's assertion of authority could not be reasonably relied upon as a manifestation of his intent to extend his enlistment.

### III.

The Navy's unilateral and involuntary extension of the term of Taylor's enlistment was without lawful authority. The Navy is detaining him solely on the basis of that involuntary extension. Taylor is not estopped from challenging it as unlawful. The judgment appealed from will, therefore, be affirmed.

Before SEITZ, Chief Judge, ALDISERT, ADAMS, GIBBONS, HUNTER, WEIS, GARTH, HIGGINBOTHAM, SLOVITER and BECKER, Circuit Judges, and WEBER, District Judge.**

SUR PETITION FOR REHEARING

GIBBONS, Circuit Judge.

The petition for rehearing filed by appellant in the above entitled case having been submitted to the judges who participated in the decision of this court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the circuit judges of the circuit in regular active service not having voted for rehearing by the court in banc, the petition for rehearing is denied. Circuit Judges ADAMS, HUNT-

** Hon. Gerald J. Weber, United States District Judge for the Western District of Pennsylvania

ER, WEIS and GARTH would grant petition for rehearing.