**UNITED STATES**

v.

**Gerald W. MORRISON, 462 04 7524, Aviation Boatswain's Mate (Fuels) First Class (E–6), U.S. Navy.**

**NMCM 85 2645.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 14 Dec. 1984.

Decided 30 May 1986.

LCDR Alvin L. McDonald, JAGC, USN, Appellate Defense Counsel.

LT Roman A. Chojnacki, JAGC, USNR, Appellate Defense Counsel.

LT W.A. Durling, JAGC, USNR, Appellate Government Counsel.

Michael F. Fasanaro, Jr., Esquire, Civilian Defense Counsel.

Before KERCHEVAL, RAPP and GRANT, JJ.

RAPP, Judge:

At a general court-martial consisting of officer members, the appellant was convicted of conspiracy to sell military aviation fuel valued at $588,000, making false official statements with the intent to deceive, selling military aviation fuel valued at $588,000, and stealing 40,000 gallons of military aviation fuel valued at $40,000. He was sentenced to a dishonorable discharge, confinement for 10 years, forfeiture of all pay and allowances, a fine of $35,000 and reduction to pay grade E–1. Briefly, the evidence at trial showed that the appellant, as a senior supervisor at the Naval Air Station (NAS), Sigonella, Sicily, fuel farm, had responsibilities including cognizance over incoming fuel shipments by tank truck from civilian sources, transfer of this fuel to fuel farm tanks, and dispensing of this fuel to various military customer activities. A large-scale scheme developed in which the appellant or others under his control (both military and Italian civilian) would pretend to off-load arriving tank trucks but in fact would let these trucks depart the base with all or part of their cargo intact. The stolen fuel would then be delivered off-base to Italian users, who would pay the appellant and the other conspirators for their illicit services. Shortages were concealed by juggling the fuel farm accounts to show false deliveries and inventories and by exaggerating spillage and stripping. The appellant both di-

rected and signed false records to cover up the scheme, which ran from October 1982 through May 1984 and involved as many as 25 co-conspirators. At trial the appellant admitted his participation but maintained that he was coerced into wrongdoing by threats of violence against himself and his family. Further facts will be set forth in our discussion of the assignments of error. Our review has encompassed the record of trial, the assignments of error, the Government's reply thereto, and the Article 38(c), Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 838(c), brief and clemency petition submitted on the appellant's behalf by the trial defense counsel.

## I

### THE COURT–MARTIAL LACKED JURISDICTION TO TRY APPELLANT.

In particular, the appellant asserts he was improperly extended beyond his expiration of active obligated service (EAOS), because he was held to face civilian, vice military charges. He relies upon two service record entries dated 15 June 1984. One states:

MBR BEING INVOLUNTARILY EXTENDED PAST CURRENT EAOS PENDING RESULTS OF INVESTIGATION OF CHARGES FILED BY CIVILIAN AUTHORITIES.

The other was signed by the appellant and states:

I ACKNOWLEDGE THAT I AM BEING INVOLUNTARILY EXTENDED BEYOND MY EAOS PENDING RESULTS OF INVESTIGATION OF CHARGES FILED BY CIVIL AUTHORITIES.

Also, the appellant offers the case of *Taylor v. United States*, 711 F.2d 1199 (3d Cir.1983), which held that the military did not have the authority to effect involuntary extensions of enlistments beyond EAOS/EAS for members facing foreign criminal charges. This issue was not litigated at trial but was raised for the first time on appeal.

We have concluded that neither the facts nor the law support the appellant's contention. The evidence shows that the appellant's commanding officer placed him in pretrial restriction on 17 May 1984 due to alleged violations of Articles 81, 107 and 121, UCMJ, 10 U.S.C. §§ 881, 907, 921. Another conspiracy charge was added on 18 July 1985. Appellant's EAOS was 19 July 1984, but he was not released then. Thus, the appellant was made aware of the charges and the intent of military authorities well before his EAOS by the charges governing his pretrial restriction and by the preferral of a further charge after the service record entries set forth above, so that he should have had no doubt that he was being extended to face military, as well as civilian, charges. In *United States v. Douse*, 12 M.J 473, 478 (C.M.A.1982), the Court of Military Appeals pointed out that the Government can preserve jurisdiction over an accused by taking an "action with a view to trial" before his EAOS. Such action must be "official" and of a nature that authoritatively signals the sovereign's intent to impose its legal processes upon the individual. *United States v. Smith*, 4 M.J. 265 (C.M.A.1978). Any acts which authoritatively presage a court-martial, when viewed in the light of surrounding circumstances, are sufficient. *United States v. Self*, 13 M.J. 132 (C.M.A.1982). Placing an accused in a status of "administrative hold" before his EAOS has been adequate to preserve jurisdiction. *See United States v. Wheeley*, 6 M.J. 220 (C.M.A.1979). Thus, pretrial restriction based on specified charges, which is even more onerous on the individual, patently signals the sovereign's intent to impose its legal processes on the appellant and authoritatively presages a court-martial. At oral argument civilian counsel for the appellant asserted that the appellant's acknowledgement of involuntary extension in the 15 June service record entry constituted an objection to such extension. We have a difficult time equating acknowledgement with an objection, but, even if we construe the entry as an objection, the appellant was put on notice by the 18 July preferral of a

military charge against him that he was being extended to face military legal action and he thereafter made no objection which is evident in the record. Civilian counsel at oral argument also asserted that the 15 June service record entry demonstrated an election by the Government to preserve jurisdiction solely to face charges by civilian authorities. This theory, however, is contradicted by the preferral of a military charge on 18 July, before the appellant's EAOS, and no legal authority has been cited for the proposition that the Government is precluded from proceeding on dual grounds for jurisdiction (i.e., amenability to trial by either military or civilian authorities). We therefore find that the imposition of pretrial restriction on 17 May 1984 and the preferral of a specific charge against the appellant on 18 July 1984 preserved jurisdiction over the appellant beyond his EAOS.

■ Even if we were to agree that the appellant's acknowledgement service record entry constituted an objection to retention beyond his EAOS, we conclude that the Government proceeded within a reasonable time after the appellant complained of his involuntary retention. *See United States v. Hutchins*, 4 M.J. 190 (C.M.A.1978). "Necessarily, determination of what constitutes a reasonable period of time for accomplishment of a specified action requires a consideration of the totality of the relevant circumstances." *Douse*, 12 M.J at 478. Trial did not commence until about six months after his EAOS, but that delay was justified by the circumstances. The case was exceedingly complicated, requiring extensive investigation by the Naval Investigative Service and the Naval Audit Service, who had to reconstruct accurate fuel records for an 18-month period. Thousands of gallons of fuel were involved, and military customers included squadrons permanently based in the United States but temporarily assigned to NAS Sigonella. In fact, the appellant chose such squadrons to victimize due to the increased difficulty in subsequent verification of fuel charges resulting from their mobility and remoteness from the scene of the crime. Besides ex-

tensive investigation at NAS Sigonella, investigators had to visit these distant squadrons and scrutinize their records. We detect no unnecessary delay by the Government but rather intense efforts to speed the case along.

The case of *Taylor v. United States*, 711 F.2d 1199 (3d Cir.1983), on which the appellant relies heavily, is distinguishable on the facts from the present case. In *Taylor*, the servicemember was involved in an off-duty, off-base automobile accident which resulted in the death of a Spanish citizen. Spain declined to waive its jurisdiction to the United States, and Taylor was convicted of manslaughter by a Spanish court. He was evidently not charged by military authorities but rather was on legal hold pending his Spanish trial and appeal, pursuant to a treaty between the United States and Spain. Taylor's enlistment was involuntarily extended at the end of his normal enlistment and a voluntary extension. The involuntary extension occurred after the affirmance of his conviction by a Spanish appellate court and was based on a Bureau of Naval Personnel Manual provision which authorized involuntary retention of Naval personnel to face civilian charges. The Court of Appeals determined that the Navy lacked authority to effect such involuntary extensions solely to ensure that military personnel were available to face civilian charges. Thus, *Taylor* is of no help to the appellant.

Therefore, we conclude that the court-martial had personal jurisdiction over the appellant.

## II

IT WAS ERROR FOR THE COURT TO EXCEPT THE WORD SIGN, AND SUBSTITUTE THEREFORE [sic] THE WORD MAKE IN THE SPECIFICATION UNDER CHARGE II.

After the presentation of evidence, arguments and instructions, the members deliberated about an hour and a half and then asked for a definition of the word "sign" in

the Specification under Charge II. The following colloquy resulted:

MJ: And the second question, a definition of the word "sign", there is no definition given in the Manual for Courts-Martial for that word. The text of the Article from—stating that offense under Article 107 says simply, that any person subject to this chapter who with intent to deceive signs any false record, return, regulation, order, or other official document knowing it to be false or makes any other false official statement knowing it to be false, etc. It does not give a definition of the word "sign".

In usual parlance the word "sign" means to fix one's imprimatur to or in somehow to fix one's name to a document [sic]. In the context of this article it said if you had a reasonable doubt that the accused or some other person—under the description of principals that I gave you—had actually signed the document, then you would have to find that the document was not signed, find that there was no signing. You could use exceptions and substitutions in this area and indicate—one could except out the "signing" and indicate "making" if, in fact, that were determined. I believe that would still be an offense under this same article.

Does either counsel have any objection to the definition of the word "sign" as given?

TC: No, sir, I believe that the word "sign" actually encompasses "making." Anytime that you use your handwriting to actually decieve [sic], that is a signature, that's a signing.

MJ: The book doesn't give that description, so I can't say that that is the case counsel, to be signing. Defense counsel?

DC: Defense would concur with your definition of sign, sir.

MJ: I think signing is to affix one's imprimatur or in some way adopt in one's name or signing it, affixing one's name or initials or whatnot to it. As I said, the—if the members have a reasonable doubt with regard to signing, there is a doubt in the members mind that anything was signed under Charge II, but there is no reasonable doubt as to a making, I believe that could be addressed by exceptions and substitutions in the manner in which I described to you before. Does either counsel have an objection to that advice?

TC: No, sir.

MJ: Defense?

DC: I'm not really sure whether the signing or the making are [sic] the same, or can be substituted, Your Honor. I would have to research it.

MJ: It would appear to me that it would still state an offense under the same section of the code based on a reading of the code and I can't give you a definition of signing, because it doesn't appear in the book, other than what I have given you. Does that answer your question? Is there any other question?

PRES (CDR WILSON): I believe we can continue our deliberations now.

.    .    .    .    .

The court closed at 1445 hours, 14 December 1984.

The court opened at 1515 hours, 14 December 1984.

MJ: ... Gentlemen, I wasn't satisfied with the definition of the word "sign" that I gave to you, so I have gone to a legal dictionary and obtained a definition for that word which I will provide to you. To sign means "to affix a signature, to ratify by hand or seal, to subscribe in one's own handwriting, to make any mark as a symbol on a document in token of knowledge, approval, or acceptance thereof." Does that better describe for you what "sign" means?

PRES (CDR WILSON): Yes, sir.

MJ: And, does that answer your question with regard to the meaning of the word "sign"?

PRES (CDR WILSON): Yes, sir.

MJ: Does either counsel have any objection to that definition?

TC: No, sir.

DC: No, sir.

MJ: Very well, court will be closed. The court closed at 1517 hours, 14 December 1984.

Subsequently, without further questions or instructions the members found the appellant guilty of the Specification under Charge II, "Excepting for the word 'sign,' substituting therefore [sic], the word 'make'."

■ We have set forth this lengthy excerpt for two reasons; first, to show the scrupulous effort made by the military judge to deal with the members' apparent uncertainty over the meanings of "sign" and "make"; second, to underscore the absence of a defense objection to the military judge's efforts. Furthermore, the defense made no objection at the time findings were announced later in the trial, and the issue was not raised until an Article 38(c), UCMJ, post-trial brief was submitted by the trial defense counsel. If the defense had an objection, it should have been submitted before the military judge returned the case to the members for further deliberation. Although expressing some uncertainty, the trial defense counsel did not ask for even a recess to research the area of concern and provide the members with proper instructions on the issue of excepting "sign" and substituting "make." Nevertheless, we will not apply the doctrine of waiver here but will instead decide the issue on its merits.

Paragraph 74*b*(2), *Manual for Courts-Martial, United States, 1969 (Rev.)* (MCM,1969), stated:

*Exceptions and substitutions.* One or more words or figures may be excepted and, when necessary, others substituted, provided the facts as so found constitute an offense by the accused which is punishable by the court and provided such an action does not change the nature or identity of an offense charged in the specification or increase the amount of punishment that might be imposed for any such offense.

Rule for Courts-Martial (R.C.M.) 918(a)(1), *Manual for Courts-Martial,*

*United States, 1984* (MCM) states, *inter alia:*

Exceptions and substitutions may not be used to substantially change the nature of the offense or to increase the seriousness of the offense or the maximum punishment for it.

The *Discussion* pertaining to R.C.M. 918(a)(1), MCM, 1984, states:

*Exceptions and substitutions.* One or more words or figures may be excepted from a specification and, when necessary, others substituted, if the remaining language of the specification, with or without substitutions, states an offense by the accused which is punishable by court-martial.

MCM, Part II at 133 (1984). These rules are based on elementary due process principles. *See United State v. Wray,* 17 M.J. 375 (C.M.A. 1984) (citing *Dunn v. United States,* 442 U.S. 100, 99 S.Ct. 2190, 60 L.Ed.2d 743 (1979)).

The Court of Military Appeals (C.M.A.) has stated that the critical question is prejudice, even if there is variance in fact. The element of prejudice is assessed by a dual test: (1) has the accused been misled to the extent that he has been unable adequately to prepare for trial; and (2) is the accused fully protected against another prosecution for the same offense. *United States v. Lee,* 1 M.J. 15 (C.M.A.1975); *United States v. Hopf,* 1 U.S.C.M.A. 584, 5 C.M.R. 12 (1952).

It is possible that no variation in fact occurred, as Article 107, UCMJ, proscribes both signing and making false official statements, and the maximum punishment is the same for either. We will take a conservative approach, however, and assume variance. Looking at the first leg of the test for prejudice, we see that the specification alleges a specific time period covering the offenses and the specific documents supposedly falsified. Our review of the record has convinced us that the same evidence would have been offered by the Government to establish the appellant's guilt whether making or signing was alleged. In particular, this evidence includes

the testimony of co-conspirators that the appellant personally made false entries and arranged for others to make false entries and the appellant's admissions that, as section leader, he was responsible for the accurate maintenance of the records in question and had actually falsified them. Thus, the appellant was not misled in preparing or presenting his defense because, whether he falsely signed or falsely made the records in question, he had cognizance over them, and was responsible for both their signing and making, requiring his intimate involvement with the forms. The second leg of the test for prejudice, protection against double jeopardy, is assessed by taking the allegations of the specification together with the evidence of record. *Hopf*, 5 C.M.R. at 14. The specification alleges violation of Article 107 over a lengthy but definite period by falsifying particular documents, and the details can be readily determined from the comprehensive record of trial, *see Lee*, 1 M.J. at 17, so the appellant is protected from double jeopardy.

The appellant has not been prejudiced by any variance between the findings and the specification under Charge II. Therefore, he was not convicted of a different or more serious offense nor was the maximum punishment increased.

### III

THE MILITARY [sic] ERRED IN DENYING APPELLANT'S MOTION TO CONSIDER ADDITIONAL CHARGE I AND CHARGE II AS MULTIPLICIOUS FOR SENTENCING PURPOSES WITH CHARGE II [sic].

The appellant's motion before arraignment to have Additional Charge I considered multiplicious for sentencing with Charge II was denied. Likewise, the appellant's motion to have Charge II considered multiplicious for sentencing with Charge III was denied. We agree with the military judge in his rulings.

Although the trial took place after the implementation of the *Manual for Courts-Martial, United States, 1984,* on 1 August 1984, the offenses were committed before that date, so we will apply the rules of multiplicity in effect prior to that implementation. The concept of multiplicity for sentencing does not come into play where separate offenses do not arise from the same act or transaction. Paragraph 76*a* (5), MCM, 1969; *see United States v. Baker*, 14 M.J. 361 (C.M.A.1983). The determination of whether offenses arise out of the same act or transaction is an elusive goal. The most reliable test is based on the concept of an "insistent flow of events." *United States v. Jobes*, 20 M.J. 506, 509 (A.F.C.M.R.1985); *see also United States v. Burney*, 21 U.S.C.M.A. 71, 44 C.M.R. 125 (1971). This standard is based on the policy that "even if an accused continued, over a period of time, to act pursuant to a single uninterrupted impetus, his actions should be considered as factually separate if time and circumstances gave him a reasonable opportunity to reflect and to choose to refrain from committing additional crimes." *Jobes*, 20 M.J. at 511–512. The objective approach evident in this test is preferable to the subjective "single impulse" analysis, which requires reliance on circumstantial evidence and mind-reading. *See United States v. Kleinhans*, 14 U.S.C.M.A. 496, 34 C.M.R. 276 (1964). In the present case the larcenies occurred when the appellant illegally diverted the truckloads of fuel. The wrongful sale of the fuel occurred at a later time when the appellant completed the transaction by receiving his payment. Similarly, the falsification of fuel records occurred at yet another time and location. Thus, there were differing times and circumstances for each of the charged offenses, as well as differing motives (falsification-concealment; larceny and wrongful sale-profit), no insistent flow of events, and opportunity after the larceny for the appellant to halt the scheme by refraining from the additional criminal activities reflected in the wrongful sale and falsification charges. The offenses, as a result, did not arise out of the same act or transaction.

Even if we were to find that the offenses in question arose out of the same act or transaction, they are not necessarily multi-

plicious for sentencing. To assist in analyzing the issue seven tests have been developed:[1]

(1) Whether each offense requires proof of a real element not required to prove the other (the elements test). *United States v. Yarborough*, 1 U.S.C.M.A. 678, 5 C.M.R. 106 (1952). *Accord United States v. Brown*, 8 U.S.C.M.A. 18, 23 C.M.R. 242 (1957); *United States v. McVey*, 4 U.S.C.M.A. 167, 15 C.M.R. 167 (1954);

(2) Whether each offense requires proof of an additional fact which the other does not (the facts test). *McVey*, 4 U.S.C.M.A. 167, 15 C.M.R. 167 (1954). *Accord United States v. Posnick*, 8 U.S.C.M.A. 201, 24 C.M.R. 11 (1957);

(3) Whether the offense contains all the constituent elements of another offense (the lesser included offense test). *Posnick, supra;*

(4) Whether each offense was committed in a transaction motivated by a single impulse (the single impulse, integrated transaction test). *Kleinhans*, 34 C.M.R. 276. *Accord United States v. Dicario*, 8 U.S.C.M.A. 353, 24 C.M.R. 163 (1957). *See United States v. Pearson*, 19 U.S.C.M.A. 379, 41 C.M.R. 379 (1970). *See also United States v. Weaver*, 20 U.S.C.M.A. 58, 42 C.M.R. 250 (1970);

(5) Whether each offense was committed at essentially the same time and the facts and circumstances surrounding each offense were such as to connect the two or more offenses, making them essentially one integrated transaction (the unity of time, existence of connected chain of events test). *United States v. Waller*, 3 M.J. 32 (C.M.A.1977); *United States v. Irving*, 3 M.J. 6 (C.M.A.1977); *United States v. Smith*, 1 M.J. 260 (C.M.A.1976);

(6) Whether each offense violates a separate societal norm (the societal norm test). *United States v. Beene*, 4 U.S.C.M.A. 177, 15 C.M.R. 177 (1954). *Accord United States v. Burney*, 21 U.S.C.M.A. 71, 44 C.M.R. 125 (1971). *See also Unit-* *ed States v. Washington*, 1 M.J. 473, 475 n. 3 (C.M.A.1976);

(7) Whether each offense involves the breach of a separate duty (the separate duty test). MCM, 1969, para. 76a (4); *United States v. Soukup*, 2 U.S.C.M.A. 141, 7 C.M.R. 17 (1953).

Next we must apply these tests to the facts of the present case:

(1) Elements test—The three offenses have at least some dissimilar elements from each other;

(2) Facts test—Each of the three offenses requires proof of a fact not needed for the others;

(3) Lesser included offense test—None of the offenses is a lesser included offense of the other two;

(4) Single impulse integrated transaction test—The larceny was complete when the appellant diverted the truckload of fuel; the wrongful sale occurred when the appellant was later paid; the falsification of records occurred at a separate time and location, and was intended to help avoid detection rather than as a medium for accomplishment of the other crimes; *see United States v. Harrison*, 4 M.J. 332 (C.M.A.1978);

(5) Unity of time/existence of connected chain of events test—same rationale as (4) above, plus the discontinuity of time and location allowed the appellant the opportunity to avoid the other offenses which he nevertheless committed;

(6) Societal norm test—The Article 107 offense interfered with the administration of the Navy by introducing false fuel records; the Article 108 offense deprived the Navy of an essential commodity (fuel); the Article 121 offense contravened the integrity of the Navy's property rights in its fuel;

(7) Separate duty test—The Article 107 offense involved a duty to maintain government records properly; the Article 108, 10 U.S.C. § 908 offense involved a duty to preserve government property; the Article 121 offense involved a duty to respect property rights.

1. *United States v. Irving*, 3 M.J. 6 (C.M.A.1977); *United States v. Smith*, 1 M.J. 260 (C.M.A.1976).

In the case of *United States v. McClary*, 10 U.S.C.M.A. 147, 27 C.M.R. 221 (1959), the Court of Military Appeals considered a black marketing operation which resulted in Article 108 (wrongful disposition) and Article 121 (larceny) charges involving the same property. The Court of Military Appeals noted that McClary was motivated by a single scheme which was the result of a unitary mental process, but that he had separate intents—one to steal and the other to sell. The Court of Military Appeals also commented that these intents had been formed simultaneously, but

> the sequence of events was such that they were severable and [McClary] could have abandoned his intent to dispose of the goods after he had executed his plan to steal. In that event there would have been only a violation of Article 121.... Further, had he been apprehended in the course of the asportation, there would have been no violation of Article 108.

*Id.* at 225. As the sale was "so truly isolated from the theft by time and other circumstances," the case required application of the "elemental test." *Id.* at 226. That is, larceny required no proof of sale and vice-versa. Moreover, there was a violation of "two distinct Congressional statutes," and there was "no compelling reason ... to say that fairness to the accused requires us to limit punishment to one." *Id.* As a result, C.M.A. found separate criminal acts (albeit part of one transaction), concluded that McClary was not being punished twice for the same crime, and determined that the offenses were separate for punishment, contrasting the situation with *United States v. Brown*, 8 U.S.C.M.A. 18, 23 C.M.R. 242 (1957), where "both the theft and the wrongful disposition were proved by the single act of transferring possession." *McClary*, 27 C.M.R. at 225. Recently, C.M.A. again reviewed the issue of separate punishment for Article 108 and 121 offenses and concluded, "[W]e have considered the historical evolution of Article 108 and our governing precedent and find no basis to deviate from the rule laid down in *United States v. McClary*." *United States v. West*, 17 M.J. 145 (C.M.A.

1984). The appellant in the present case undoubtedly had a single purpose—personal enrichment at government expense. But, he had three intents—to steal, to sell and to conceal his crimes. After each larceny he could have stopped short of wrongful sale, and, if he had been apprehended in the course of diverting the fuel trucks, no sale would have occurred. Also, both larceny and sale could have occurred without falsification of records. Larceny and sale were not proved by a single act as in *Brown, surpa*. Accordingly, we conclude that the appellant's offenses in violation of Articles 107, 108 and 121 were not multiplicious for sentencing.

## IV

THE MILITARY JUDGE ERRED IN DENYING APPELLANT'S MOTION TO DISMISS ALL CHARGES AND SPECIFICATIONS ON THE GROUNDS THAT THE APPELLANT HAD BEEN DENIED HIS RIGHT TO A SPEEDY TRIAL.

At trial and before this Court the appellant has contended that his right to a speedy trial was denied in contravention of the Sixth Amendment of the United States Constitution, Article 10 of the Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 810, paragraphs 68*i* and 215*e* of the 1969 Manual for Courts-Martial, and R.C.M. 707 of the 1984 Manual for Courts-Martial.

### A

We will first look at a chronology of the significant events in the case:

27 March 1984: NIS confidential informant first implicates the appellant in the theft of aviation fuel from NAS Sigonella fuel farm.

11 April 1984: CO, NAS Sigonella requests NIS assistance.

18 April—11 May 1984: Investigation and surveillance by NIS.

15 May 1984: Aviation Boatswain's Mate (Fuels) Third Class (ABF3) S confesses that he, appellant, and others were involved in fuel thefts; the appellant is

interviewed and requests military counsel.

16 May 1984: The appellant is placed in pretrial restriction relating to the current charges.

18 May 1984: The appellant is placed in legal hold.

21 May 1984: The Italian Guardia Di Finanza originates requests for United States assistance in investigating illicit trafficking in petroleum products and for detention of the appellant.

11 June 1984: Letter is sent from CO, NAS Sigonella to Guardia Di Finanza assuring investigative cooperation and detention of military members and giving notice that U.S. Government intended to exercise primary right of jurisdiction over U.S. military personnel. The appellant is permitted to consult by telephone with military counsel located at the Naval Legal Service Office, Naples, Italy.

15 June 1984: Service record entries are made involuntarily extending the appellant past his EAOS.

16 June 1984: The appellant is released from pretrial restriction.

17 June 1984: ABF3 M confesses his involvement in the conspiracy to steal Navy aviation fuel and implicates the appellant.

18 July 1984: Charge of conspiracy to commit larceny of Navy aviation fuel is preferred against the appellant.

25 September 1984: The United States asserts primary jurisdiction and requests the Italian authorities to waive jurisdiction.

30 September 1984: The appellant requests information and a speedy trial.

1 November 1984: The appellant requests speedy trial and offers to waive the Article 32, UCMJ, pretrial investigation.

27 November 1984: Charges of conspiracy to commit larceny of Navy aviation fuel, signing false official records, and wrongful sale of Navy aviation fuel are preferred against the appellant.

6 December 1984: Charges of larceny of Navy aviation fuel are preferred against the appellant.

12 December 1984: Trial of the appellant commences.

## B

■ We summarily reject the appellant's contention that R.C.M. 707 applies in this case, based on *United States v. Leonard,* 21 M.J. 67 (C.M.A.1985), where the Court of Military Appeals concluded "that the President intended R.C.M. 707's 120-day time limit between notice of preferral/imposition of restraint and trial to apply only to those cases in which notice of preferral of charges or imposition of restraint occurred on or after August 1, 1984." *Id.* at 71. Pretrial restraint in the form of restriction was imposed upon the appellant on 16 May 1984, and a predecessor of one of the present charges was preferred on 18 July 1984. No additional restraint was imposed on the appellant, and other charges were not preferred until 27 November. Trial commenced on 12 December, well within the 120-day limit of R.C.M. 707(a).

## C

Having determined that R.C.M. 707 does not apply to this case, we will look instead to the standards in effect for determining speedy trial issues before 1 August 1984. The right to a speedy trial guaranteed by the sixth amendment of the U.S. Constitution has been carried over into military law by Article 10 of the UCMJ, by paragraphs 215e and 68i of the 1969 Manual for Courts-Martial, and by abundant case law purporting to provide amplification.

■ If Article 10, UCMJ were strictly construed, it could be argued that the Government's accountability under that statutory provision began on 16 May 1984, when the appellant was placed in pretrial restriction. Article 10 states, *inter alia:* "When any person subject to this chapter is placed in arrest or confinement prior to trial, immediate steps shall be taken to inform him of the specific wrong of which he is accused and to try him or to dismiss

the charges and release him." The Court of Military Appeals has stated that not every instance of arrest or confinement will "trigger" Article 10's protection, but rather an accused must be "in arrest or confinement for a period of some significant duration before the Government runs the risk of activating Article 10." *United States v. Nelson,* 5 M.J. 189, 190 (C.M.A.1978). In *Nelson* the accused was in pretrial confinement for only 13 days at the beginning of the 205-day period between the offenses at issue and the trial; C.M.A. found no violation of Article 10. In contrast, C.M.A. found a violation of Article 10 in *United States v. Powell,* 2 M.J. 6 (C.M.A.1976), where the accused was in pretrial restriction for 110 of the 161 days needed to get him to trial. In the present case the appellant's pretrial restriction placed him in the status of "arrest" within the terms of Article 10. *See Nelson,* 5 M.J. at 191, and Article 9, UCMJ, 10 U.S.C. § 809, which defines "arrest" as the "restraint of a person by an order, not imposed as a punishment for any offense, directing him to remain within certain specified limits." We find that the present case is comparable to *Nelson* so that the appellant's 30 days of pretrial restriction are not of "significant duration" to trigger Article 10, comprising only the first one-seventh of the 210 days it took to get the appellant to trial. We want to emphasize that we are not relying upon a simple mathematical formula but have based our determination on a review of all the circumstances (to be discussed in more detail below), which in no respect shows the "lack of concern for the Codal commands for expeditious prosecution" criticized by C.M.A. in *Powell,* 2 M.J. at 8, and relied on by C.M.A. in distinguishing *Powell* and *Nelson,* 5 M.J. at 191.

■ Paragraphs 68*i* and 215*e* of the 1969 Manual for Courts-Martial briefly and generally discuss speedy trial, adding preferral of charges to the events starting the

speedy trial clock and fixing the burden upon the Government to account for delays in bringing an accused to trial. *See* Article 30(b), UCMJ, 10 U.S.C. § 830(b). Paragraph 215*e* sets forth several matters to be considered in determining if the time elapsed has been unreasonable:

> [W]hether the accused has earlier demanded trial and, if so, when; whether any portion of the delay was at the instance of the defense; how much time was reasonably required for pretrial processing, investigation, and preparation; whether the delay or any part thereof was arbitrary or oppressive; and whether the accused was in pretrial restraint and, if so, the nature of that restraint.

Case law has fleshed out this skeletal outline.

One case in particular, *United States v. Burton,* 21 U.S.C.M.A. 112, 44 C.M.R. 166 (1971), has been profoundly influential in delineating the rights of servicemembers to speedy disposition of charges. *Burton* addressed two aspects of speedy trial. The first (and more well-known) involved continuous pretrial confinement over 90 days and is not applicable to the present case because there was no pretrial confinement or conditions of pretrial restraint imposed on the appellant which were so onerous as to constitute pretrial confinement. The second pertained to cases in which the accused was not in pretrial confinement beyond 90 days but had made a demand for speedy trial, and likewise appears inapplicable to the present case, because the appellant served no pretrial confinement.[2] Even though *Burton* may not be applicable, we nevertheless must determine whether the Government has proceeded with reasonable diligence and without deliberate oppression of the appellant or a lack of concern for the requirement of expeditious prosecution. *Powell, supra; United States v. Amundson,* 23 U.S.C.M.A. 308, 49 C.M.R. 598

**2.** *See United States v Johnson,* 1 M.J. 101, 106, (C.M.A.1975); *Burton,* 44 C.M.R. at 172; *United States v. Mock,* 49 C.M.R. 160 (ACMR 1974).

(1975). This determination requires a functional analysis of all facts involved in the delay, including the length of the delay, the reasons for the delay, any demand for speedy trial by the appellant, and any specific prejudice to the appellant. *Barker v. Wingo*, 407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972); *see United States v. Hagler*, 7 M.J. 944 (NCMR 1979). In resolving this issue we must necessarily examine the totality of circumstances leading up to the appellant's trial. Considering only the period between demand and trial would ignore factors significantly affecting the process, especially in a complex case like the present one.

The charges in the present case involved a complicated scheme of larceny facilitated by falsification of records spanning 20 months and encompassing at least two dozen co-conspirators. A loss of as much as a million gallons of aviation fuel worth a million dollars was suspected. To ensure adequate investigation NIS had to "farm out" portions to their agents in other parts of the world to interview witnesses who had been transferred to other duty stations or separated from the Navy. A specialized audit team had to be dispatched to NAS Sigonella from the Naval Audit Service in Washington, D.C. Because apparent falsification made existing records unreliable, the audit team had to reconstruct inventory records as a whole over a lengthy period of time. This task was gravely hindered by the wily machinations of the co-conspirators to hide their crimes, such as victimization of patrol squadrons which were assigned to NAS Sigonella only for short periods of temporary duty, after which they returned to their distant home bases. Reconciliation of fuel farm and squadron fuel records thus was made much more difficult, requiring the audit team to travel to the home bases (Jacksonville, Florida and Brunswick, Maine) of the five visiting squadrons for on-site review of the relevant records. As much as two weeks was needed to audit each squadron, after which the results had to be compiled and evaluated along with other records establishing fuel receipts by NAS Sigonella. Illness of a key audit team member interfered with the analysis of audit results, and the involvement of Italian citizens and laws further complicated the situation by necessitating international coordination of prosecutorial efforts to satisfy treaty obligations. The information discovered during the audits and ongoing investigation necessitated additional investigation in the form of further audits and witness interviews. NIS reports of investigation had to be prepared and sent to Naples from various areas of the world. Receipt of investigative and audit reports continued into November 1984. Conflicting commitments of auditors had to be resolved.

The appellant undoubtedly experienced adverse effects while awaiting trial. He was involuntarily extended beyond his EAOS, subjected to a period of pretrial restraint, and removed from his normal duties. Nevertheless, the record does not show that his "efforts to adequately defend himself" were hindered, *Barker, supra;* i.e., he was promptly put on notice of the potential charges, and during the period of his relatively brief restriction (and thereafter) he was able to consult counsel, gather evidence, and contact witnesses. The terms of the appellant's pretrial restriction and legal hold status imposed minimal restraint and comported with his seniority, so they were far from "oppressive." *See Barker, supra,* and para. 215e, MCM, 1969. The gravity of the charges and the serious nature of the potential penalties could have caused the appellant to be apprehensive, but we fail to see any indication that his "anxiety and concern" were greater than normally experienced by an accused facing similar jeopardy. *See Barker, supra;* nor were delays "arbitrary," in the sense of lacking justification or resulting in unfair treatment of the appellant. *See* para. 215e, MCM, 1969. Furthermore the appellant's demands for trial did not go unanswered. The above chronology shows that 73 days elapsed between the appellant's first de-

mand (on 27 September) for speedy disposition of the charges against him and the commencement of his trial. A second request was made on 1 November, 32 days after the first. Within a few days after the first, CO, NAS Sigonella provided various information sought by the defense. In response to the second, the original charges were preferred against the appellant on 27 November, and the Additional Charge was preferred on 6 December.

Weighing all the circumstances, we find that the Government, through showing the complexity of the case and the unusually extensive efforts required to prepare for trial, has thoroughly justified the delay in putting the appellant on trial. We do not ignore the adverse effects on the appellant caused by his seven months of awaiting trial, but rather we are impressed that the Government made reasonable efforts to expedite investigation and to minimize such effects, and that any prejudice to the appellant is greatly outweighed by the amount of preparation necessitated by the complexity of the case. As a result, we conclude that the appellant was not denied his right to a speedy trial under the provisions of Article 10, UCMJ, or the sixth amendment of the Constitution.

V

APPELLANT PRAYS THIS COURT REDUCE THE SENTENCE AWARDED BY THE COURT-MARTIAL.

Based on our review of the entire record, including the presentation of the appellant's civilian counsel at oral argument before this Court, we have determined that an unsuspended dishonorable discharge is appropriate under the circumstances of this case for the appellant, a senior petty officer who abused his position by facilitating large-scale thefts of Navy aviation fuel over an extended period of time for personal profit.

The findings and sentence, as approved on review below, are affirmed.

Senior Judge KERCHEVAL and Judge GRANT concur.

**UNITED STATES**

v.

**Roy B. KECK, 488 58 6629, Operations Specialist Third Class (E-4), U.S. Navy.**

**NMCM 85 2922.**

U.S. Navy-Marine Corps Court of Military Review.

Sentence Adjudged 7 May 1985.

Decided 30 May 1986.

